The Chicago and Alton Railroad Company

*v.*

The People, for use of David D. Pierson.

*Filed at Springfield March 29, 1883.*

1. Railroads—*what is a "regular passenger train" which is required to stop at county seat stations.* A through passenger train, equipped and operated in the same manner as other passenger trains on the same road, carrying passengers and baggage as other trains, and running upon the official time table of the company the same as its other passenger trains do, the only difference being that the other trains stopped at all the stations while this did not, is held to be a "regular passenger train," within the meaning of the act approved May 29, 1879, which requires all such trains to stop at county seat stations a sufficient length of time to receive and let off passengers with safety. The act does not, perhaps, include a wild train, a freight or excursion train, or a special train.

2. Same—*act requiring regular passenger trains to stop at county seats is a proper police regulation.* The act of May 29, 1879, requiring all regular passenger trains to stop at county seat stations long enough to receive and let off passengers with safety, is not a regulation of inter-State commerce, and therefore inhibited by the constitution of the United States, though the line of the road may pass through different States. Such a law is but a proper exercise of the police power of the State.

3. Same—*subject to.reasonable police regulations.* A railroad company takes its charter upon the implied condition that its franchises shall be exercised subject to the power of the State to impose such reasonable regulations upon it as the comfort, safety or welfare of society may require.

Appeal from the Appellate Court for the Third District; —heard in that court on appeal from the Circuit Court of Greene county; the Hon. Albert G. Burr, Judge, presiding.

Mr. Henry C. Withers, for the appellant.

Mr. James R. Ward, for the appellee.

Mr. Justice Craig delivered the opinion of the Court:

This was an action brought against the Chicago and Alton Railroad Company to recover a penalty for a failure to stop

one of its passenger trains at its station at Carrollton, the county seat of Greene county, a sufficient length of time to receive and let off passengers, as required by an act approved May 29, 1879. (Laws of 1879, page 225.) The act provides: "Every railroad corporation shall cause its passenger trains to stop upon its arrival at each station advertised by such corporation as a place for receiving and discharging passengers upon and from such trains, a sufficient length of time to receive and let off such passengers with safety: *Provided,* all regular passenger trains shall stop a sufficient length of time at the railroad station of county seats to receive and let off passengers with safety."

On the 11th day of December, 1879, (the time the railroad company was charged with the omission of the duty imposed by the law,) the company was operating three passenger trains on its line of road through Carrollton. These trains passed through the town each way daily. Two of these trains stopped regularly at the station, but the other, known as the "Kansas City Express," which passed through, going south, at 5 o'clock A. M., and returned, going north, at 11:32 o'clock P. M., made no stop whatever at Carrollton, except on Sundays the train was stopped to deliver and receive the mail. It is contended by the plaintiff that the train which passed through Carrollton at 11:32 o'clock in the night of December 11, 1879, was a regular passenger train, within the intent and meaning of the statute, and because the company failed and refused to stop this train at Carrollton and receive passengers who desired to take passage, it is liable for the penalty imposed by the law. On the other hand, it is claimed by the railroad company that this being a through train from St. Louis to Kansas City, conveying through passengers, was not, under the circumstances, a regular passenger train, within the meaning of the statute, and that the company was not bound to stop at Carrollton, although it was a county seat.

The train in question was equipped and operated in the same manner as any other passenger train on the road. It carried passengers and baggage as did other trains. It run upon the official time table of the company as other trains did. Indeed, the only difference between this and the other passenger trains on the road was, that the other two stopped at all the stations while this did not. On account of this difference, can the train, within the meaning of the statute, be regarded other than a regular passenger train? We think not. The language of the act would not, perhaps, include a wild train, a freight train, an excursion train or a special train; but where a train was engaged in carrying passengers, running regularly every day upon an advertised time card of the company, equipped as all other passenger trains are, we are satisfied such a train was designed by the legislature to fall within the terms of the act, "all regular passenger trains." Had the legislature intended to except a fast train or a through train from the operation of the law, it would have been an easy matter to have framed the law in such a way that no doubt could have existed in regard to the intention, and if such had been intended, language of a different character would no doubt have been used.

But it is contended that if the act is broad enough to include the train in question, then its effect is a regulation of commerce between the States, and hence is inhibited by the constitution of the United States. The act does not undertake to regulate commerce between States. It imposes no restriction upon the introduction or transportation of any article of commerce whatever. A State regulation which requires all passenger trains to stop at railroad crossings, at draw-bridges, and requires the speed of trains to be reduced when running through incorporated towns and cities, has never, so far as we are informed, been regarded as a regulation of commerce, although the line of railroad thus regulated may pass through several States. And if the legislature has

the right to require all trains to stop at a railroad crossing, and to require the speed of all trains to be reduced when running through a city or incorporated town, on the same principle, and for a like reason, it has the power to require all regular trains to stop at the station in all county seats. A law of this character is but a proper exercise of the police power of the State, which has always been upheld and sustained by the courts.

This railroad company accepted its charter upon the implied condition that its franchises would be exercised subject to the power of the State to impose such reasonable regulations as the comfort, safety or welfare of society might require. Numerous cases might be cited in support of this principle. In *Galena and Chicago Union R. R. Co.* v. *Loomis*, 13 Ill. 548, a law requiring a bell or whistle to be attached to each engine upon a railroad, was sustained, and the court held that "the legislature had the power, by the enactment of general laws, from time to time, as the public exigencies may require, to regulate corporations in the exercise of their franchises, so as to provide for the public safety." In *Ohio and Mississippi R. R. Co.* v. *McClelland*, 25 Ill. 140, an act requiring all railroads then in operation to be fenced, and imposing a penalty for non-compliance, was sustained, and it was held that acts of incorporation are subordinate to general police regulations. In speaking of railroad corporations it is there said: "They are subject to be controlled for the general good, * * * and for that purpose the legislature may, beyond all doubt, regulate the speed of their trains, require them to place guards at bridges and other points of danger, and they may, as they have done, require the sound of a whistle or a bell at road crossings, for the safety of passengers, together with their property." See, also, *Thorp* v. *R. and B. R. R. Co.* 27 Vt. 150. A reference to other cases will not be necessary.

If the legislature had the right, in the exercise of the police power of the State, to provide for the regulation of railroad corporations in the respects named in the cases cited, there can be no doubt in regard to the validity of the law in question.   Did the act contribute to the comfort, safety or welfare of the public?   If it did, and did not deprive the company of any essential right conferred by its charter, its passage was a proper exercise of the police power.   (Cooley on Const. Lim. 577; Potter's Dwarris on Statutes and Const. 458; *Lake View* v. *Rose Hill Cemetery*, 70 Ill. 191.)   In the enactment of the law requiring all regular passenger trains to stop at county seats, the legislature, no doubt, had in view the great benefit the public would derive in the increased facilities for reaching the county seat, to aid in the dispatch of business in courts, in the prompt arrest and prosecution of criminals who might be indicted in the courts, in the attendance of witnesses, grand and petit jurors,—indeed, the prompt and efficient transaction of all business in the courts held at the county seat, and the facility for the examination of the records on the sale and conveyance of property.   These and various other matters pertaining to the welfare of the public doubtless led to the enactment of the law, and in its enactment we are fully satisfied that the legislature transcended none of its powers, nor did it violate any chartered right of the railroad company.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*