# THE PEOPLE *ex rel.* Leonidas Walker

## *v.*

## THE LOUISVILLE AND NASHVILLE RAILROAD COMPANY.

*Filed at Mt. Vernon January 25, 1887.*

1. RAILROADS—*general power to make contracts.* While it is true that railway corporations can only make such contracts as the legislature may authorize, yet when made within their powers, their contracts, in legal effect, are the same as like contracts made by natural persons under similar circumstances.

2. SAME—*consolidated companies—to what rights, duties and obligations of the original companies they succeed.* Where two railway companies consolidate, the original companies become extinct, and the new company thus formed succeeds to the ownership of the two roads, together with all other property, effects, rights and franchises held or enjoyed by either of the old companies, and also becomes subject to all the liabilities and burdens of such old companies, and each of them, which are imposed by law on such old companies.

3. So where a railroad company accepts a subscription or donation from a county upon certain conditions imposed by the vote of the people, and by its contract with the county board, made in pursuance of law, and afterwards consolidates with other railway companies under articles requiring the new company to perform such conditions, such original company, and each of the new companies, which, by means of the consolidation, succeed to the ownership of the original road, will thereby become bound to perform all the conditions so imposed by the contract with the county and by the vote of the people.

4. SAME—*of a contract to furnish passenger facilities at a particular point—obligation of consolidated company.* Where a railway company, under a legal obligation to maintain a depot for passengers and freight within the limits of a town, and to stop all its passenger trains at such depot, whether express or otherwise, for the purpose of letting off and taking on passengers, consolidates with another railway company owing no such duty, the new company thereby formed becomes liable, and bound to assume and discharge such duty.

5. SAME—*contract by railroad company, whether a covenant running with the land—obligation resting upon purchasers.* A contract of a railway company to perform certain conditions with a county making a subscription or donation in its aid in consideration thereof, is, however, merely a personal undertaking, and is not in the nature of a covenant running with land; and a purchaser of such company's road and property is under no personal obligation to perform such contract.

6.   So a railway corporation which succeeds to the ownership of the property and franchises of another company by purchase under a decree of foreclosure against it and its lessee, will owe the county no duty not imposed by law, and will take the road and its property absolutely discharged from the contract between the county and the original railway company, as well as the conditions imposed by the vote of the people.

7.   SAME—*of the right of a company to withhold proper facilities, or to abandon part of its road.*   A railway company is bound to construct its road to and from the several points named in its charter, and, when built, to run its trains over its entire line, in such a manner as to afford reasonable facilities for the prompt and efficient transaction of such legitimate business as may be offered to it on any and every part of its road; and this obligation is equally binding on its successors. No part of the road can be abandoned without rendering its franchises liable to forfeiture.

8.   SAME—*change of terminal points, or location of depot.*   After having once fixed the terminal points of its road, and located its depot in a town or city, a railway company has no power afterward to change the same without legislative authority, but it will be held to its election.

9.   SAME—*duty to stop all passenger trains at county seat.*   Where a railroad is built to a town, as required by its charter, and a depot is established at the end of its line within such town, which is a county seat, the company operating such road will have no discretion as to which of its passenger trains shall stop there and which shall not, as it would have, within certain reasonable limitations, if such town was not a county seat, but all its passenger trains must stop at such place.   It is not sufficient that all its trains may stop at a new depot located at a junction with another road, a quarter of a mile beyond the corporate limits of such town.

This is a petition filed in this court by the People, on the relation of the State's attorney of Hamilton county, against the Louisville and Nashville Railroad Company, for a *mandamus,* to compel such company to run all its passenger trains to the town of McLeansboro, and to stop there for the receiving and discharging of passengers.   The facts of the case are sufficiently stated in the opinion of the court.

Mr. WILLIAM HAMILL, Mr. T. M. ECKLEY, and Mr. LEONIDAS WALKER, for the petitioner:

As the charter of the St. Louis road calls for a line running to McLeansboro, and the charter of the Evansville road calls for a line running from McLeansboro, the consolidated

4—120 ILL.

road can have no charter except on a line running through McLeansboro; and as the charters themselves provided that subscriptions and donations to the roads, respectively, should be upon such conditions as might be agreed upon, those conditions, to be effective, must necessarily run with the charter, and be obligatory upon any company operating under it.

A consolidated company and its lessee must, in all things, conform to the charter of the company whose road is being used. *Chicago* v. *Evans*, 24 Ill. 55; 2 Redfield on Railways, (4th ed.) 277.

As a common carrier, a railway company will be held to a full and complete performance of the duties imposed upon it by the law. *Railway Co.* v. *People*, 56 Ill. 365; *Vincent* v. *Railroad Co.* 49 id. 33.

Corporations may be compelled to perform public duties and obligations which are imposed on them by their charters, and also those duties which necessarily arise from the nature of the privileges and obligations of their charters. Moses on Mandamus, 155-157; *Regina* v. *Railway Co.* 16 Eng. L. and Eq. 299; 18 id. 199; *Blakeman* v. *Canal Co.* 1 M. & R. 154; *Building Society* v. *Crowell*, 65 Ill. 459; *Railroad Co.* v. *Hall*, 1 Otto, 343.

The foreclosure of the mortgage against the St. Louis and Southeastern Railway Company and the Evansville and Southern Illinois Railroad Company could not affect the rights of Hamilton county, for the reasons its rights were a matter of record when the mortgage was given, and it was not made a party to the suit. *Scates* v. *King*, 110 Ill. 456.

A corporation purchasing the property and franchises of another assumes the same obligations imposed on that other. Taylor on Law of Private Corp. 416, 418; *Beardstown* v. *Railroad Co.* 1 Metc. 200.

Where a railroad is sold under a foreclosure of a mortgage, and the purchasers organize another company, they will still be compelled to run the road on the line, and according to

the terms of the original charter, and can not abandon any part thereof. *People* v. *Railroad Co.* 24 N. Y. 261.

McLeansboro being a county seat, the defendant is bound by the statute to stop all its regular passenger trains at that place. Rev. Stat. chap. 114, sec. 74; *Railroad Co.* v. *People*, 105 Ill. 657.

Where a railway company has once exercised its power of election by locating its line and depots, its power is exhausted, and can not again be exercised except by legislative authority. *State* v. *Turnpike Co.* 10 Conn. 157; *Mason* v. *Railroad Co.* 35 Barb. 381; *Griffin* v. *House*, 18 Johns. 396; *Railroad Co.* v. *Railroad Co.* 2 Vroom, 208; *Moorehead* v. *Railroad Co.* 17 Ohio, 340.

Mr. J. M. HAMILL, for the defendant:

The charters of the original roads did not definitely fix the termini, but these and the intermediate points were left to the election of the companies, in the exercise of their discretion. The exact point at which the one road was to approach McLeansboro and the other was to depart from it, was left entirely, by the legislature, to these corporations. The very vague and indefinite language used in these charters on this subject, is conclusive that it was the intention of the legislature to leave to the discretion of these corporations the precise location of their respective lines of railway at McLeansboro. *Iron Works Co.* v. *Railroad Co.* 5 Allen, 221; *Railroad Co.* v. *Railroad Co.* 1 Gray, 340; *Hentz* v. *Railroad Co.* 13 Barb. 646; *Railroad Co.* v. *Speer*, 56 Pa. St. 325; *Struthers* v. *Railway Co.* 87 Pa. St. 282; *Moses* v. *Railroad Co.* 21 Ill. 522.

It has been held, that where a railway company was authorized to construct its railway "from Charleston," etc., the company had no authority to enter the city, but that the boundary of the city was the *terminus a quo*. *Railroad Co.* v. *Payne*, 8 Rich. 177.

The effect of the transfer, at the foreclosure sale, of the property and franchises of the St. Louis and Southeastern railway, to a new corporation organized under the general laws of the State, was not the reviving of the old one under the original charter, nor the creation of a new one in lieu of the original. It was the creation of a new, separate and distinct corporation, in no manner dependent upon the original corporation or its charter.

The franchise to be a corporation is not a subject of sale and transfer, unless the law has, by some positive provision, made it so. But the franchise to build, own and manage a railroad, and to take tolls thereon, are not necessarily corporate rights. They are capable of existing in and being exercised by natural persons, and there is nothing in their nature inconsistent with their being assignable. *Commonwealth* v. *Smith,* 10 Allen, 448; *Hall* v. *Railway Co.* 2 Redf. Am. Ry. Cases, 621; *Ragan* v. *Aiken,* 9 Lea, 610; *Meyer* v. *Johnson,* 53 Ala. 237; *Wilson* v. *Gaines,* 3 Tenn. Ch. 602; *Coe* v. *Railroad Co.* 10 Ohio St. 386; *Railroad Co.* v. *Railroad Comrs.* 112 U. S. 609.

As Hamilton county conveyed no real estate to the railway company, either for right of way or depot purposes, the contract between the company and the county could not attach to the real estate of the company, and constitute a covenant running with the land, which would be binding on all succeeding purchasers of the railway. *Ferry Co.* v. *Railway Co.* 94 Ill. 83.

The Southeast and St. Louis Railway Company is not a re-organization of the St. Louis and Southeastern Railway Company, but a new and wholly independent company, and the former company is not in any manner bound by any of the contracts made by the latter, save such as were paramount to the deed of trust under which the road was sold. 107 Mass. 1; 12 Bush, 673; *Morgan County* v. *Thomas, supra; Railway Co.* v. *County Clerk,* 74 Ill. 27; *Bruffett* v.

*Railway Co.* 25 id. 353; *People ex rel.* v. *Railway Co.* 57 id. 440; *Stewart's Appeal,* 72 Pa. St. 291; *Vilas* v. *Railway Co.* 17 Wis. 497; *Smith* v. *Railway Co.* 18 id. 17; *Wright* v. *Railway Co.* 25 id. 46; *Gilman* v. *Railroad Co.* 37 id. 317; *Commonwealth* v. *Railway Co.* 52 Pa. St. 506; Jones on Railroad Securities, secs. 653-659.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

This is a proceeding by *mandamus*, commenced in this court by the State's attorney of Hamilton county, in his official character, against the Louisville and Nashville Railroad Company, to compel it to stop its trains at what is known as the "old depot," in McLeansboro, the county seat of Hamilton county. The depot in question is located on the branch of the defendant's road, about a quarter of a mile due west of the court house and public square.

There is no ground for controversy as to the facts. As admitted by the pleadings, they are, in substance, as follows: On the 3d of November, 1868, a majority of the electors of Hamilton county voted to subscribe $200,000 to the capital stock of the Shawneetown branch of the Illinois Central Railroad Company. The line of road contemplated by the charter of that company extended from Tonti, on the Chicago branch of the Illinois Central railroad, to Shawneetown, the intermediate points being Salem, Mt. Vernon and McLeansboro. (2 Private Laws, 1865, 211-220.) The proposition to subscribe the $200,000, above mentioned, was voted for upon the express condition that McLeansboro was to be a point with a station on the road. In pursuance of a provision in the charter of the St. Louis and Southeastern Railway Company, approved March 10, 1869, the county court of Hamilton county, on the 11th day of June, 1869, subscribed to the capital stock of the latter company the $200,000 which had been voted to the former company. The St. Louis and Southeastern Railway Company, by the terms of its charter, was

authorized to construct, maintain and operate a railway from a point on the Mississippi river opposite St. Louis, to Shaw-neetown, on the Ohio river, by way of Mt. Vernon, McLeansboro and Equality.

On the 26th of March, 1869, the legislature passed an act incorporating the Evansville and Southern Illinois Railroad Company, by the terms of which that company was authorized to construct and operate a railway from McLeansboro, Hamilton county, through the towns of Enfield and Carmi, to the State line, on the Big Wabash river. The charter of this company authorized the counties through which the road should run, to make donations to it, upon such terms as might be agreed upon between it and the said counties. (3 Private Laws, 10.) The corporate authorities of Hamilton county, on the 7th day of June, 1870, in pursuance of the provisions of said act, and in conformity with an affirmative vote of a majority of the electors of the county, cast on the 2d day of November, 1869, entered into a contract with the Evansville and Southern Illinois Railroad Company, whereby the county agreed to donate to the company, upon the completion of the road and the running of trains thereon, the sum of $74,000 in interest bearing bonds of the county. This donation, by the terms of the contract, was made upon the following express condition: "That the said railroad company should erect and forever maintain a depot for passengers and freight at McLeansboro, within the corporate limits thereof, and not exceeding one-half mile from the court house in said town, and that all passenger trains running upon said road, whether express or otherwise, should stop at said depot to receive and put off passengers, and that no discrimination should ever be made against said town of McLeansboro, or any person or persons shipping to or from said town, in favor of any other point, in the relative charges for carrying either freight or passengers thereto or therefrom." The same conditions were imposed by the vote of the people in favor of the donation.

It was also stipulated in this contract, that the company might, without forfeiture of the contract, consolidate with other companies, on condition that the rights of the county in the respects stated should be fully protected.

On the 21st day of February, 1871, the said company was consolidated with the St. Louis and Southeastern Railway Company, under the name of the latter company. On the 12th of May following, the county court entered an order of record, approving the consolidation of the two companies, upon the express stipulation and understanding, as set forth in said order, "that nothing therein contained should, in any wise, affect or invalidate any of the duties, obligations and promises to the county, made by any of said railroad companies prior to said consolidation," or by the new company since the consolidation. The roads of the two companies thus consolidated were built as contemplated by their respective charters, and the $200,000 subscription was paid to the consolidated company in installments, of $100,000 each, on the 23d day of October, and the 28th day of November, 1871, respectively. On the 1st day of January, 1872, the county delivered to the consolidated company its bonds, amounting to $37,000, in full payment and satisfaction of the donation of $74,000 to the Evansville and Southern Illinois Railroad Company, the remaining $37,000 having been already otherwise settled and discharged by the county, to the satisfaction of the company.

It thus appears that the entire subscription and donation to the two companies were fully paid and discharged by the county. Both lines of the consolidated road were completed in 1872, and the old depot in question was located, as heretofore stated, within a quarter of a mile of the court house, and otherwise in strict conformity with the conditions upon which the subscription and donation were made by the county to these companies. It further appears, that on the 1st day of December, 1869, (which, it will be remembered, was prior

to any of the foregoing transactions, except the subscription of $200,000,) the St. Louis and Southeastern Railway Company issued its bonds to the amount of $2,250,000, secured by a deed of trust to George Opdyke and Philo C. Calhoun, upon the company's road and its appurtenances, together with all its rights and franchises. After its consolidation with the Evansville and Southern Illinois Railroad Company, to-wit, on the 1st of March, 1871, the consolidated company issued another series of bonds, amounting to $1,000,000, secured by a second trust deed to the same trustees, upon the road, its appurtenances, etc.

On the 28th of February, 1871, the company consolidated with the Evansville, Carmi and Paducah Railroad Company, whose line of road extended from Evansville, and formed a junction with the St. Louis and Southeastern railway at its eastern terminus on the Wabash. Consolidations were subsequently made with other companies owning lines of road extending into the States of Kentucky and Tennessee. On each consolidation, a new series of bonds was issued, and secured, like the others, by deeds of trust upon the road. Upon a bill filed by the bondholders, the Circuit Court of the United States for the Southern District of Illinois, on the 30th of August, 1880, rendered a decree foreclosing all of the above mentioned deeds of trust. By virtue of that decree, the St. Louis and Southeastern railway consolidated, together with all the company's property rights and franchises, was, on the 16th day of November, 1880, sold, at public outcry, to William F. Whitehouse and Charles W. Opdyke, as representatives of the bondholders.

On the 12th of November, 1880, the Southeast and St. Louis Railway Company was organized, under the general laws of this State, for the purpose of purchasing and operating said railway, which purchase was consummated on the 27th of January, 1881. On that day, Whitehouse and Opdyke, purchasers under the decree, conveyed the entire road, with every-

thing pertaining to it, to the said Southeast and St. Louis Railway Company, and the latter company thereupon leased the same to the Louisville and Nashville Railroad Company, the present defendant. The defendant is now operating the road under its lease, in violation of the contracts between the county and the original companies.

The first question to be considered is, to what extent, if any, is the defendant company bound by the stipulations and agreements between the county and the original companies to whom the subscription and donation were respectively made. That the Evansville and Southern Illinois Railway Company, and each of the companies which, by means of consolidation, respectively succeeded to the ownership of the two roads, became bound to maintain a depot in McLeansboro, and to stop thereat all passenger trains, in conformity with the vote of the people and the contract between the county and the original companies, there can be no reasonable ground for doubt. But the Southeast and St. Louis Railway Company, through which the defendant claims, did not succeed to the ownership of these roads by means of consolidation. It, as we have seen, claims through Whitehouse and Opdyke, purchasers at the foreclosure sale. Whatever title they acquired it still has, subject to the defendant's lease, and the lessee owes the county no duties which were not imposed, by operation of law, upon the purchasers at the foreclosure sale. The defendant contends that the purchasers at that sale took the property free and absolutely discharged from the contracts between the county and the original companies, as well as the conditions imposed by the vote of the people themselves. We fully concur in this conclusion. It is not contended, nor, indeed, is there any ground for such contention, that the promises and stipulations of the original companies with the county are covenants, or in the nature of covenants, running with the land. This is manifestly so, for the reason that the contracts and stipulations in question have not the slightest

reference to the purchase or sale of land. They are in no sense a contract about land, or any interest therein.

The petitioner, however, contends, in substance, first, that the depot having been established in pursuance of the contracts and stipulations in question, which were a part of the public records of the county, the purchasers of the property at the foreclosure sale, and their assignees, including the defendant, must be presumed to have purchased with notice of the county's·rights; second, that these contracts and stipulations with the county having been expressly authorized by the charter of the original companies, became, in some way or other not very clearly defined, obligatory and binding upon all subsequent owners of the property. As we are clearly of opinion that the last branch of the contention is unsound, it is unnecessary to consider the first.

We do not understand, that because a corporation is specially empowered to make a particular contract, by reason thereof the contract, when made, will differ, in its legal consequences, from a like contract entered into by a natural person without any such special authority. The making of all contracts, to be valid, must be authorized by law, and there is no difference in this respect between the contracts of corporations and of natural persons, and it is a matter of no legal significance whether the making of a particular contract is authorized by statute, or by the common law. Natural persons, *sui juris,* are authorized by the common law to make any and all contracts which.are not expressly forbidden, or impliedly so, by reason of ·being in contravention of some known rule of law, of good morals, or of public policy. On the other hand, corporations, of whatever class or type, being artificial persons, merely, can only make such contracts as the legislature giving them being has authorized them to make. Their contracts, however, when made, are, as already stated, in legal effect, the same as like contracts made by natural persons under similar circumstances.

Looking at the contracts with the county in the light of these well recognized principles, we can not regard them as anything more than the personal undertakings of the companies that entered into them. All persons dealing with corporations must be presumed to know that their continued existence and solvency are, in the nature of things, more or less uncertain. In this respect, corporations do not differ from natural persons. When, from any cause, they become extinct, or, in other words, die a civil death, those who have trusted them without security of any kind, have nothing to look to for indemnity, but their assets. But, as in the case of natural persons, it is often found, when their assets are looked to for such purpose, they are exhausted by the claims of those who had business foresight enough to have them secured by mortgages, or other liens upon such assets. Such was the case here. The county, in this case, might doubtless have exacted security for the faithful performance of the companies' undertaking; but it did not do so, and hence it finds itself without any indemnity for the companies' broken covenants. So long as the two roads were in the hands of the original companies, or in the hands of either of the several companies to which they passed by consolidation, they would clearly have been liable, in due course of legal proceedings, for any breach of said contracts, and doubtless a court of equity would have compelled a specific performance of them at the suit of the county, had there been any disposition to disregard them; but there was not. The contracts being a matter personal to the parties that entered into them, any suit for their breach in the respects stated, should, on principle, be brought in the name of the county, and we are quite clear, if there were nothing to support the present action but the contracts relied on, it could not be maintained.

This brings us to the more important and controlling question in the case, namely, whether this suit can be maintained on general common law principles. In order to pass upon

this question intelligently, it is important to have a clear understanding of the location of the two branches of the road with respect to the town of McLeansboro and the depot in question.

The two branches of the road leading towards St. Louis gradually approach each other, until they converge into a single line at a point one mile and a quarter, or thereabouts, north-west of the old depot. The connection thus made is generally called the main junction of the two roads. In making this junction, the Shawneetown branch, as already seen, passes through the corporate limits of McLeansboro in a north-westerly direction. The Evansville line of the road, however, passing north of the town, and extending directly to the main junction, leaves the principal part of McLeansboro about a mile to the south, and does not, at any point, come nearer than a quarter of a mile of the corporate limits of the town. Such being the case, in order to comply with the requirements of the charter of the Evansville and Southern Illinois Railroad Company, making McLeansboro a terminal point, and also with that company's contract with the county to stop all its trains at the depot to be established and maintained within the corporate limits of the town, it became necessary to build an extension from the so-called main line, down to the depot in the town. This was in part done by putting in a so-called "Y" track, connecting both branches of the road. This "Y" track, commencing on the Evansville branch at a point nearly due north of the old depot, by gradually bearing to the south, circles around from a westerly to a south-easterly direction, until it reaches and connects with the Shawneetown branch of the road, about a half mile above the depot. From this point the company has but one line or track down to the depot, for both branches of its road.

It will be borne in mind, when these connections were made and a common depot established, the two old companies had, by reason of their consolidation, become extinct, and the new company thereby created had succeeded to the ownership of

both roads and all the assets of the old companies. Such new company not only succeeded to the ownership of the two roads, together with all other property, effects, rights and franchises held or enjoyed by either of the old companies, but it also became subject to all the liabilities and burdens of said old companies, and each of them. *Ridgeway Township* v. *Griswold*, 1 McC. 291; *Davenport* v. *Dawes*, 18 Wall. 626; *New Orleans Gaslight Co.* v. *Louisiana Light and Heat Producing Manufacturing Co.* 11 Fed. Rep. 277; *Shields* v. *Ohio*, 5 Otto, 319; *Railroad Co.* v. *Maine*, 6 id. 499; *Tomlinson* v. *Branch*, 15 Wall. 460. Among the obligations then resting upon the Evansville and Southern Illinois Railroad Company, which were assumed by the new company, was its contract with the county to establish and forever maintain a depot for passengers and freight within the corporate limits of McLeansboro, and to stop all its passenger trains at such depot, whether express or otherwise, for the purpose of letting off and taking on passengers. Under the charter of the original company, it would have been sufficient to have built its line of road to the corporate limits of the town, but nothing less would have met its requirements. This contract, however, required more. Under it, the company was bound to establish and maintain a depot in the town, within the prescribed limits from the court house, and having stipulated to stop all its passenger trains at such depot, it, by implication, contracted to build its road to the depot. The consolidated company did, as already shown, establish a depot in the town, within the required distance of the court house. This was done about the first of January, 1872, when both lines of the road were completed.

As we view the facts, while this depot was placed on the Shawneetown branch, it was also, at the same time, located at the western terminus of the Evansville branch of the road. It is no objection to this view, that trains coming down to the depot, after leaving the so-called "Y" extension, pass over what is generally known as the track of the Shawneetown

branch.    That portion of the track, as already indicated, we regard as a part of each line of road.    While, for mere convenience of speech and of exposition, we call the curve in the Evansville line, commencing a quarter of a mile north of the town limits, the "Y" extension, it is, in truth and in fact, a part of the main line itself; and the same is true, as we have just seen, of that part of the Shawneetown branch which lies between its connection with the "Y" extension and the depot. That part of the Evansville branch of the road running west from the commencement of the curve on the north side of the town, extends entirely beyond McLeansboro, while the charter only authorizes a road to be built *from* the town, in the very opposite direction.    Keeping this in view, it would therefore seem much more reasonable to regard so much of the road as lies west of the curve, as a mere spur or extension from the main line, to give an additional and more direct connection with the other branch of the road.·

In 1872, there was built on the Evansville line north of the town, and a short distance east of the commencement of the curve leading down to the depot, a small box-house, which was used, for the time being, as a stopping place or way-station, without any conveniences or accommodations for passengers getting on or off there, nor was any station agent kept there.    This building was burnt down some time in 1875, after which the place was abandoned as a station or stopping place altogether, during which time all passenger trains on the Evansville line ran down to the depot.    The defendant itself operated the road in this manner for about four years. In 1885, however, it built another depot, now known as the "new depot," on the site of the little box-building which was burnt down in 1875, as above stated.    Since the completion of this depot, the defendant has ceased to run any of its passenger trains on the Evansville line to McLeansboro at all. It runs four passenger trains over the line daily,—two going east, and two west.    Two of these trains pass the town in

daylight, and the other two after night. The company, by way of compensation for having ceased to run its passenger trains to McLeansboro, as formerly, has made an arrangement by which an accommodation train is run morning and evening from McLeansboro, to connect with its day trains at the new depot. Under this arrangement, when connections do not fail, as they often do, passengers at McLeansboro desiring to travel on the day trains, are enabled to make connections at the new depot, and passengers on those trains desiring to go to McLeansboro, can do so by the return accommodation. This special or connecting train, running from McLeansboro to the new depot, is a mixed or an accommodation train, that comes out from Shawneetown in the morning and returns there in the afternoon of the same day. It is admitted, however, upon the record, that this train frequently fails to reach McLeansboro in the morning in time to connect with the morning train on the Evansville line, which must necessarily result in great inconvenience and more or less positive injury to the public. It is also admitted by the pleadings, that the company has made no provision whatever for connecting Mc-Leansboro with the other two daily trains which pass over the line in the night, and that "as great or greater number of passengers get on and off the night trains  *  *  *  as on the day trains." Furthermore, it is expressly charged in petitioner's replication, "that the defendant does not run a sufficient number of trains upon the Shawneetown branch of said railroad, as now run, to accommodate the public," and the truth of this allegation is admitted by the defendant's demurrer to the replication. Such, in substance, are the facts presented by the record before us.

When the vast amount of money paid by the people of Hamilton county to secure the stopping of all trains on the road at the established depot within the corporate limits of the town is considered, it presents a case of peculiar hardship; and while, as we have seen, this feature of the case can

not be made an independent ground of relief, yet it is nevertheless a makeweight in it of such persuasive character as to call for a strict enforcement of whatever legal rights the people have in the premises. The company, as just seen, has already stopped running any of its passenger trains on the Evansville line to the town. As to one-half of these trains it has provided an indifferent, inefficient and unsatisfactory substitute. As to the other half, no provision is made at all to connect them with the town. The passengers on or for the latter trains are left to get to and from the town, at their own expense, as best they can. Thus, the citizens of McLeansboro, and those having occasion to go to or from there, are deprived of the conveniences and advantages resulting from the stopping of the company's trains at the town depot. To them, these conveniences and advantages are valuable rights,— rights which cost the people of the county dearly at the outset,—rights which, as we have seen, were enjoyed by them under the management of other companies for some nine years, and which the defendant itself, by its own acts and conduct, has conceded and extended to the public for some four years more, making altogether a period of thirteen years during which they have been enjoyed by the public and fully recognized by the successive owners and operators of the road. We are of opinion the company, under the circumstances shown, is now estopped from raising any question as to its duty to stop its passenger trains at the town depot.

The Evansville and Southern Illinois Railroad Company was authorized to build a road *from* McLeansboro to the State line, on the Big Wabash river, and nowhere else. After having built the road, it was bound to run its trains over its entire line, in such a manner as to afford reasonable facilities for the prompt and efficient transaction of such legitimate business as should be offered it on any and every part of its road. The duty to thus operate the road is just as binding upon the defendant as it was on the original company. The fact that

through business may be more remunerative than way business, affords no justification for neglecting the way business. Nor can the company abandon its road, or any part of it, without rendering its franchises liable to forfeiture.    These obligations and duties which attached to the company that built the road, as just observed, apply with equal force and stringency to the defendant.    The former had a large discretion in locating the road; yet, as McLeansboro is made a terminal point by its charter, it was imperative that the road should extend to that town.    Whether some distance in the town or merely to it, whether the approach or entry was to be made from the north or south side, or from some other point, were questions purely within the discretion of the company.    That discretion has been exercised, and those questions finally and irrevocably settled. · This the company did by the erection of a depot in the town, the building of its tracks to it, and the stopping of all its trains there, with a trifling exception, for a period of some thirteen years. · During this time, business interests have doubtless grown up and shaped themselves with reference to the location as originally fixed by the company.    Property has, no doubt, been bought and sold upon the faith of the company's action, and it may well be assumed its value is affected more or less by it.

That a railway company, after having fixed the terminal point of its road in a town or city, has no power to afterwards change the location, is fully settled by the authorities.    In Pierce on Railroads, (pp. 254, 255,) the author states the law very clearly on this subject.    It is there said: "The power of the company to determine its location, when once exercised, is exhausted.    It may have a discretion as to its termini, or the selection of its intermediate points, or its route between certain fixed points; but, having exercised the discretion, it can not change the location without legislative authority.    This is in accordance with the ancient rule of the common law, that 'if a man once determine his election, it shall be determined forever.'"

5—120 Ill.

As the charter required the road to be built to McLeansboro, and that having been done and a depot established at the end of its line in the town, the defendant has no discretion as to which of its passenger trains it will stop there and which it will not, as it would have, within certain reasonable limitations, if McLeansboro were not a county seat. As it is, it is the imperative duty of the company to stop all of its regular passenger trains there. This is expressly enjoined by the 88th section of chapter 114 of the Revised Statutes. (Starr & Curtis' ed.)

That the four trains in question which daily pass over the Evansville line are "regular passenger trains," within the meaning of the statute, is conclusively settled by the case of *Chicago and Alton Railroad Co.* v. *The People, use of Pierson,* 105 Ill. 657. The fact that all these trains may stop at the new depot, a quarter of a mile beyond the corporate limits of the town, does not relieve the company either from its common law or statutory duties in this respect. For this purpose the stopping of its trains miles distant from the town would be equally available, unless it can be said, as matter of law, that the stopping of a train a quarter of a mile *from* a place is stopping it *at* the place, which, of course, it can not be. The very statement of the proposition involves an absurdity so gross in its character as to forbid serious consideration. But outside of this statutory duty, we think the defendant is bound, on general common law principles, to stop a sufficient number of its trains at the depot to meet the demands of public convenience and business necessities, and it is admitted upon the record, as already seen, that under the present arrangement this is not done.

A peremptory writ of *mandamus* will therefore be awarded, in conformity with the prayer of the petition.

*Writ awarded.*

SCOTT, C. J., and SHELDON and CRAIG, JJ., dissenting.