THE OHIO & MISSISSIPPI RAILWAY COMPANY

V.

THE PEOPLE OF THE STATE OF ILLINOIS, EX REL.

*Railroads—Failure to Stop at Advertised Station—Statutory Penalty—Act of July 1, 1879—Action of Debt—Evidence—Instructions.*

1. In an action of debt brought to recover from a railroad company the statutory penalty for failing to stop one of its trains at its station at Carlyle, the county seat of Clinton county, this court declines to interfere with the judgment for the plaintiff, the train in question being a regular passenger train and the plaintiff being a person aggrieved within the meaning of the act.

2. The unaccepted offer by the conductor to give the passenger a pass, if he would leave the train at an intervening point and take the next train to his destination, does not absolve the company from the performance of its duty in this regard.

[Opinion filed January 10, 1889.]

APPEAL from the Circuit Court of Clinton County; the Hon. JESSE J. JONES, Judge, presiding.

This action in debt was brought in the name of the people for the use of George Locey, to recover from appellant the statutory penalty for failing and omitting its duty to stop its regular passenger train, on which Locey was then a passenger, at the appellant's railroad station at Carlyle, the county seat of Clinton county, in this State. The cause was tried by a jury; a verdict for plaintiff for $150 was returned; defendant entered a motion for a new trial, which the court overruled and rendered judgment on the verdict, and defendant took this appeal. The evidence is not voluminous, and is substantially as follows: Locey testified that on January 21, 1887, he was a resident of Carlyle, the county seat of Clinton county, and was in Sumner, a flag station on defendant's road, and there got word to come home at once. On receipt of the message, he inquired of defendant's agent at the station, what train he could take on defendant's road to reach Carlyle at the earliest possible time, and in reply was informed he could sit up that night and flag train No. 3, and it would stop for him; that he had a ticket to Carlyle, and about half-past two o'clock in the morning he flagged the train No. 3, which stopped, and he got on. The conductor took up his ticket to Carlyle and punched it, and in reply to a question by Locey asking if that was the right train for Carlyle, the conductor said it was; that the train following did not stop at Sumner, but his train did not always stop at Carlyle, and he would let him know at Shattuck, and the train following did stop at Carlyle and he could take it. When No. 3 reached Shattuck it was still dark. No one was in the railroad office there. The train ran by the station to a water tank. The train did not stop at Carlyle, but carried him to O'Fallen, thirty miles beyond, from which point he was compelled to purchase a ticket to Carlyle and return on another train; that the train No. 3 was a regular passenger train, running every day on a schedule of its own, having a conductor, engineer, fireman, brakeman, and carrying passenger cars and sleeping coaches just like any through passenger train, and was advertised as such by defendant and ran through from Cincinnati to St. Louis. For defendant, Ireland, the conductor on defendant's train upon

which Locey was a passenger, testified he took up Locey's ticket but informed him his train did not stop at Carlyle and he would have to alight at some station between Sumner and Carlyle and take the train following his; that at Shattuck, east of Carlyle, when his train stopped for water, he sent his brakeman to notify Locey it was his last chance to change trains before reaching Carlyle, and went in person and requested him to make the change, offering him a pass for his transportation on the following train, but Locey refused and insisted the train on which he then was, was bound to stop at Carlyle; that he then started his train, did not stop at Carlyle, but ran through that place according to the regulations of the company; that his train was No. 3, running from Cincinnati to St. Louis, leaving Cincinnati at 7 o'clock P. M., followed by train No. 5, running between the same points and leaving Cincinnati at 8 o'clock P. M.; that No. 5 was the regular night express, and No. 3 but a section of that train, run to carry mail, express and baggage, which otherwise would have to be carried by No. 5; that No. 3 carried a passenger coach when the train was not too heavy. On cross-examination he testified he had been a passenger conductor on defendant's railway for four years; that train No. 3 on which Locey was a passenger, was his regular train, with locomotive; three passenger coaches and sleeper, conductor, brakeman and engineer, just as all passenger trains have; as far as the public is concerned, it was like all regular passenger trains on defendant's road, but the railroad men knew it as the section of the train following; that it was run on its own schedule time and made stops for passengers; that he considered No. 3 a regular passenger train.

Horton, the brakeman, testified he requested Locey, by the conductor's direction, to change at Shattuck; that No. 3 was forward section of No. 5 and was run for accommodation of dead freight and baggage and express; it did not always carry passengers; had been on it when no passenger coach was attached; it was equipped at the time in question like a regular passenger train, except it carried box cars with the same kind of engine and train as a regular passenger train. McMahon, defendant's train dispatcher, testified, at one time but one

through night train was run on defendant's road from Cincinnati to St. Louis, and owing to a large amount of express matter sometimes to be carried, and the engines on the west division not being as heavy as those on the east, it became a custom to divide the train about half way between those points into two trains and run these over the west division, a safe distant apart. Finally, the express business increasing, the sections were run as separate trains, giving the forward section or train all the dead freight, and the rear train most of the regular passenger business. The forward section was given a separate number, No. 3, and was run for safety on its own schedule time, carried baggage of passengers on rear train, mail matter, and all the express matter. Train No. 3 was run to lighten No. 5 and enable it to make its time. To do this, No. 3 took on the Louisville sleeper, and also carried a passenger whenever it could, and divided local stops with No. 5, until it reached Flora. No. 5 was considered the regular passenger train; it stopped at all county seats. On cross-examination he testified, No. 3 was equipped as any passenger train; it ran on its own schedule time; it had a number of its own; it was a distinct train from train No. 5. It was given its number and schedule time for accommodation and safety in running; it was advertised as one of the through passenger trains of the company; it was not a regular passenger train in the sense No. 5 was, and was, strictly speaking, but a section of that train. Plaintiff introduced in evidence defendant's time table east and west, of four daily trains each way (including train No. 3) between Cincinnati and St. Louis, stopping at way points.

Messrs. POLLARD & WERNER, for appellant.

Messrs. WHITE & LAMBE, and M. P. MURRAY, for appellee.

GREEN, P. J.   By the amendment to the act in relation to fencing and operating railroads, in force July 1, 1879, it is provided: "Every railroad corporation shall cause its trains to stop on their arrival at each station advertised by such corporation as a place for receiving and discharging passengers

upon and from such trains, a sufficient length of time to receive and let off such passengers with safety: *Provided*, all regular passenger trains shall stop a sufficient length of time at the railroad station of county seats to receive and let off passengers with safety." And for a violation of any of the foregoing provisions it is further provided: The railroad corporation guilty of such violation "shall be liable to the person aggrieved for all damages done to person or property by reason thereof, with costs of suit, and in addition thereto, said corporation shall forfeit the sum of not less than $100, nor more than $500, to be recovered in an action of debt, in the name of the people of the State of Illinois for the use of any person aggrieved, before any court of competent jurisdiction." No question is made on behalf of appellant that the proof was not sufficient to establish its liability for a violation of one of the provisions of the foregoing act as alleged in the declaration, except it is claimed that it does not appear by the evidence the train on which Locey was a passenger was a regular passenger train within the meaning of the statute, and that he was not shown by the evidence to have been a person aggrieved.

The evidence introduced on behalf of appellee and appellant leaves no doubt in our judgment as to the real character of the train in question. It was a through train, running daily between Cincinnati and St. Louis on defendant's railway, with regular passenger train, engine, passenger coaches and sleeping car, equipped in all respects as a regular passenger train; it was provided with conductor, engineer, fireman and brakemen; it was given its number and was run on its own schedule time, carried passengers and baggage, made stops for passengers, and was advertised by appellant as one of its regular through passenger trains, running daily. The public was notified apparently in every way possible that this train was a regular passenger train, and persons were thereby induced to so regard and use it. The appellant reaped all the benefit of patronage so invited, and must be required to perform the duty imposed upon it by the statute or forfeit the penalty to be paid for violating its provisions. In a case on all fours

with this, C. & A. R. R. Co. v. The People, use, etc., 105 Ill. 657, it is said in the opinion: "The train in question was operated in the same manner as any other passenger train on the road. It carried passengers and baggage as did other trains. It ran upon the official time-table of the company as other trains did; indeed, the only difference between this and the other passenger trains on the road was that the other two trains stopped at all stations, while this did not. On account of this difference, can the train, within the meaning of the statute, be regarded other than a regular passenger train? We think not." Again it is there said, "where a train was engaged in carrying passengers, running regularly every day upon an advertised time-card of the company, equipped as all other passenger trains are, we are satisfied such a train was designed by the Legislature to fall within the terms of the act, 'all regular passenger trains.'"

From all the evidence in this record, the train in question at the time Locey was a passenger thereon, was a regular passenger train, within the meaning of the act, and as defined by the Supreme Court in the case cited, and it is quite as clear that George Locey, for whose use this suit was brought, was a person aggrieved by the omission of duty on the part of appellant as averred in the declaration. He was anxious to go to his home in Carlyle at once, as requested in the message he received. He asked appellant's agent at Sumner what train would carry him to Carlyle at the earliest possible time, and by direction of the agent waited for and got on board of train No. 3, as the proper train for him to take. The conductor also told him it was the right train for Carlyle, and took his ticket and informed him he might have to change trains to stop at Carlyle but he would let him know at Shattuck. On reaching that place he saw the railroad office was closed. The train did not stop at the station but passed to the water tank, and then he was in the dilemma of either walking back before daylight of a winter morning and wait outside of a closed office until the train following should arrive, or remain on train No. 3 and be carried past his destination thirty miles, and pay his fare back. He chose the latter alternative as per-

haps the least dangerous, though more expensive; he was doubtless disappointed by being delayed in his arrival home, and suffered anxiety during the delay, and in addition thereto incurred extra expense, all in consequence of appellant's omission to perform its legal duty of transporting him to Carlyle and there stopping its train a sufficient time to let him off with safety. The offer of the conductor to furnish him with a pass to Carlyle on the train No. 5, which he declined to take, did not absolve the appellant from the performance of its duty. Locey had already paid for transportation to that place, and had the right to demand he should be taken there upon the train he then was a passenger. To hold he was not aggrieved by the omission of appellant to perform its duty would require us to utterly disregard the evidence, which establishes the fact he was a person seriously and illegally aggrieved by reason of such omission of duty.

It was not error for the court below to modify defendant's first instruction and refuse to give the fourth and fifth instructions requested on its behalf. The modification of its seventh instruction was erroneous, and some of the instructions given on behalf of plaintiff were not strictly accurate, but taking the instructions as given, as a series, we apprehend the jury were not misled thereby as to the law, or that the verdict rendered was the result of misdirection in that regard by the court; but on the contrary it was fully sustained and warranted by the evidence. Perceiving no error in the record requiring the reversal of the judgment appealed from, it is affirmed.

*Judgment affirmed.*