## The Illinois Central Railroad Company

*v.*

## The People of the State of Illinois.

*Filed at Springfield November 2, 1892.*

1. STATUTE—*evidence in respect to its passage.* The fact that an act or statute has received the signatures of the speakers of both houses and the approval of the governor, is *prima facie* evidence of its constitutional passage and validity. But such evidence may be overcome by showing from the journals that the act was not passed in the mode prescribed in the constitution.

2. A bill was introduced in the House of Representatives, numbered 833, entitled a bill for "An act to amend an act in relation to fencing and operating railroads, approved March 31, 1874." The journal entries preserved the identity of the bill by using the same number, but the first entries referred to the bill as one to amend section 63 of the act in relation to fencing and operating railroads, when, in fact, the section sought to be amended was section 25. After the engrossing of the bill the title thereof was amended by striking out the figures "63" and inserting "25" in their place, and it was passed as amended. Section 25 of the original act was in the Revised Statutes of 1874 numbered as section 63, so that the section had two numbers: *Held,* that as there was but one House bill numbered 833 its identity was not lost; that the amendment of its title after the second reading did not defeat the bill, and that it was legally passed. There is no provision of the constitution requiring a bill to preserve the same title through all its stages in both houses, and in the absence of proof to the contrary it will be presumed that a statute was read on three different days in each house.

3. The amendment of 1879 to section 25 of the act of 1874, in relation to fencing and operating railroads, was passed in accordance with the constitution, and is a valid law.

4. EVIDENCE — *opinion of witness — conclusion of fact.* Whether a certain fast mail train of a railway company is a regular passenger train, within the meaning of the statute requiring such trains to stop at all stations which are in county seats, can not be shown by the opinions of witnesses as to the fact, as this would allow them to decide the very point in dispute. The opinions of witnesses should not be asked in such a way as to cover the very question to be found by the jury or court.

5. SAME—*when expert testimony is admissible.* A witness is not permitted to give his opinion as an expert in reference to a matter which does not involve a question of science, skill or trade. To determine whether a train is a regular passenger train is not a subject which so

far partakes of the nature of science as to require a course of previous habit or study in order to the attainment of a knowledge of it.

6. Where the matter inquired about requires no special knowledge, and may be determined by the jury upon a sufficient description of the facts in regard to it, it is not proper to receive the testimony of experts.

7. MANDAMUS—*regulating stopping of railway trains at county seats.* If a clear legal right to the writ of *mandamus* is shown by the party applying for it, he is entitled to its issuance. It lies to compel a railway company to stop all its regular passenger trains at county seat stations long enough to allow passengers time to get on and off the same.

8. SAME—*waiver of demurrer to alternative writ by answering.* The alternative writ of *mandamus* stands in the place of a declaration to which the return is an answer. If the respondent answers to the merits after his demurrer to the form of the petition is overruled, he will thereby waive his grounds of demurrer, and can not urge the same objection to the petition after trial on the merits.

9. RAILROADS—*what is a regular passenger train.* A through train of cars, equipped and operated as other passenger trains, carrying passengers and baggage, and running upon a time table the same as other trains, and differing from them only in that it does not stop at all the stations, is a regular passenger train, within the meaning of section 25 of the act in relation to fencing and operating railroads, as amended in 1879.

10. SAME—*duty to stop passenger trains at county seats.* Where a railway company has constructed its road through or into a county seat, and has located and maintained a passenger station there for several years, the statute requires it to continue to stop its trains there; and its obligation to perform this duty is not affected by the circumstance that such station may be the terminus of the road.

11. SAME—*change of location of stations, etc.* Where a railway company has fixed the terminal point of its road in a town or city it can not afterward change the location. It may have a discretion as to its termini, or the selection of its intermediate points; but when this power of location is once exercised it is exhausted, and the company can not change the location without legislative authority:

12. SAME—*must operate entire line of road.* Where a railway company, under its charter is authorized to select and locate its termini, and is required to operate its road as a continuous line, it will be required to operate the same to the points selected by it as its termini. It will have no right to treat the legal and actual terminus in a city as though it was on a side-track, to be visited only with such cars or trains as it sees fit to send there. Nor is the requirement of the law met by the use of short trains, for transfer purposes.

13. Same—*power of State to regulate.* The act of 1855, enabling railway companies to enter into operative contracts, and the act of 1867, to facilitate travel and transportation, in no manner interfere with the right of the State to require such companies to stop all their regular passenger trains at stations in county seats long enough for passengers to get on or off the same.

14. Same — *regulations, whether interference with inter-State commerce.* The enforcement of the proviso to section 25 of the act relating to the fencing and operating of railroads, which requires all regular passenger trains to stop a sufficient length of time at the railroad stations of county seats to receive and let off passengers with safety, in respect to mail trains running through this State into other States, will not conflict with section 8, article 1, of the constitution of the United States, which confers upon Congress the power to regulate commerce among the States; nor is such proviso invalid as interfering with the carrying of the mails.

Appeal from the Circuit Court of Alexander county; the Hon. A. K. Vickers, Judge, presiding.

This is a petition for a mandamus, filed on April 17, 1891, in the Circuit Court of Alexander County in the name of the People by the State's Attorney of that County, against the Illinois Central Railroad Company to compel that company to cause all of its regular passenger trains coming into the city of Cairo to be brought down to the passenger station at the intersection of Second and Ohio Levee streets in that city, and there stopped a sufficient length of time to receive and let off passengers with safety. Amendments were made to the petition, and a demurrer to the amended petition was overruled. Amendments were also made to the answer. The Circuit Court sustained a special demurrer to certain paragraphs of the amended answer, and replications being filed to certain other paragraphs thereof, a jury was waived and the cause submitted to the court for trial, by agreement, upon the issues of fact. The issues of fact were found in favor of the petitioner, and judgment was rendered in accordance with the prayer of the petition. From such judgment the present appeal is prosecuted.

Messrs. Green & Gilbert, for the appellant:

The amendment to section 25 of the act in relation to fencing and operating railroads, which constitutes the proviso to section 88 of chapter 114 of the statutes of 1889, did not pass the House of Representatives of the General Assembly, and never became a law. The title is absolutely essential to the existence of a legislative act. Sutherland on Stat. Const. sec. 211; *Larrison* v. *Railroad Co.* 77 Ill. 17; Const. sec. 13, art. 4.

The journals of either branch of the legislature are proper evidence of the action of that branch upon all matters before it. *Spangler* v. *Jacoby,* 14 Ill. 297; *Turley* v. *Logan County,* 17 id. 151; *Prescott* v. *Trustees,* 19 id. 324; *People* v. *Starne,* 35 id. 121.

As to the effect of entries in the legislative journals, see *State* v. *McBride,* 4 Mo. 303; *Thomas* v. *Dakin,* 22 Wend. 9; *State* v. *Moffitt,* 5 Ohio, 223; *Southworth* v. *Railroad Co.* 2 Gibbs, (Mich.) 287.

· The fast mail train does not come within the purpose and intent and legal effect of the proviso of section 88 of the statutes of 1889. *Railroad Co.* v. *People,* 105 Ill. 657; *People* v. *Railroad Co.* 120 id. 48; *St. Clair County* v. *Bollman,* 15 Bradw. 279; Sutherland on Stat. Const. sec. 262.

Section 88 of chapter 114 of the statutes of 1889, is a highly penal statute. See sec. 91; *Diversey* v. *Smith,* 103 Ill. 378.

Penal statutes should receive a strict construction. Potter's Dwarris, 245; *Andrews* v. *United States,* 2 Story, 203; *Stinsen* v. *Pond,* 2 Curtis, 502; *United States* v. *Ten cases of Shawls,* 2 Paine, 162.

A proviso in a statute is to be strictly construed. *United States* v. *Dickson,* 15 Pet. 141.

The enforcement of the proviso of said section 88, to the extent of compelling appellant to operate the south bound fast mail train down into Cairo, would be a conflict with acts of Congress, and would be a violation of the Federal constitu-

tion. *Railroad Co.* v. *People,* 105 Ill. 657; Const. of U. S. art. 1, sec. 8, 3d clause.

Increasing the distance and extending the time for transporting passengers to the other States is a burden upon interState commerce. *Crutchen* v. *Commonwealth,* 141 U. S. 47; *Call* v. *People,* 136 id. 104; *Welton* v. *Missouri,* 1 Otto, 275; *Machine Co.* v. *Gage,* 10 id. 676; *Robbins* v. *Taxing District,* 120 U. S. 489; *Railway Co.* v. *Fuller,* 84 id. 560; Cooley's Limitation, 572.

The evidence for plaintiffs does not show the fast mail train to be a regular passenger train. *Railroad Co.* v. *Washington,* 142 U. S. 492; *Railroad Co.* v. *People,* 105 Ill. 659.

As to the right to have this remedy, see *People* v. *Hatch,* 33 Ill. 140; *People* v. *Railroad Co.* 55 id. 110; *People* v. *Lieb,* 85 id. 484; *People* v. *Weber,* 86 id. 285; *Cristman* v. *Peck,* 90 id. 151.

The petition stands in the place of the alternative writ. *People* v. *Glann,* 70 Ill. 232; High on Ex. Rem. sec. 548.

Defects in substance may be taken advantage of at any time before the writ is granted, even after return is made. *People* v. *Davis,* 93 Ill. 133.

Messrs. LANSDEN & LEEK, for the appellee:

The amendment of 1879 to section 25 of the act in relation to fencing and operating railroads, was legally adopted. The journals show that the use of the figures "63" was a clerical error. *Timm* v. *Harrison,* 109 Ill. 593; *Johnson* v. *People,* 83 id. 431; *People* v. *Loewenthal,* 93 id. 191; *Walker* v. *Springfield,* 94 id. 364.

It is held in *Hensoldt* v. *Petersburg,* 63 Ill. 157, that when an act of the legislature is duly certified to by the Secretary of State, and published as a law of the State, the courts must receive it as having been passed in the manner required by the constitution, unless the contrary is clearly made to appear.

The amendatory act of 1879 was passed upon by this court in *Railroad Co.* v. *People,* 105 Ill. 657, and *People* v. *Railroad Co.* 120 id. 48, and by the Appellate Court in *Railroad Co.* v. *People,* 29 Ill. App. 561, and it has no doubt been acted upon and obeyed by every railroad company in the State having a road or roads running into or through county seats.

That the proviso in section 88 of the Railroad law is not invalid for the reason that it is a regulation of inter-State commerce, see *Railroad Co.* v. *People,* 105 Ill. 657.

Such proviso is valid as a police regulation. *Railroad Co.* v. *Loomis,* 13 Ill. 548; *Railroad Co.* v. *McClelland,* 25 id. 140; *Lake View* v. *Rose Hill Cemetery,* 70 id. 191; *Thorp* v. *Railroad Co.* 27 Vt. 150.

The statute in question is recognized as valid, and was enforced in the cases of *People* v. *Railroad Co.* 120 Ill. 48, and *Railroad Co.* v. *People,* 29 Ill. App. 561. See *Railroad Co.* v. *Mississippi,* 133 U. S. 587; *Davidson* v. *State,* 4 Texas App. 545; *Smith* v. *Alabama,* 124 U. S. 465.

Whether or not the train in question was a regular passenger train was not a question of science, skill or trade, upon which an expert is permitted to give an opinion. *Railroad Co.* v. *Railway Co.* 67 Ill. 142; *Hopkins* v. *Railroad Co.* 78 id. 32; *Chicago* v. *McGiven,* id. 347; *Pennsylvania Co.* v. *Conlan,* 101 id. 93; *Fire Proofing Co.* v. *Poczekai,* 130 id. 139.

Appellant is required by law to operate its road as a continuing line. *Railroad Co.* v. *Hall,* 91 U. S. 343; *People* v. *Railroad Co.* 120 Ill. 48; *United States* v. *Railroad Co.* 4 Dill. 478; *Railway Co.* v. *People,* 120 Ill. 200; *State* v. *Railroad Co.* 29 Conn. 538; *Railroad Co.* v. *Suffern,* 129 Ill. 274.

Mr. Justice Magruder delivered the opinion of the Court:

1. One of the defenses made by the respondent below, and the disallowance of which is here assigned as error, was, that section 88 of chapter 114 of the Revised Statutes, being section 25 of the Act of 1874 in relation to fencing and operating

railroads as amended in 1879, did not pass the lower house of the legislature and never became a law.

Section 25 of "An Act in relation to fencing and operating railroads," approved March 31, 1874, in force July 1, 1874, read as follows : "Every railroad corporation shall cause its passenger trains to stop, upon the arrival at each station advertised by such corporation as a place for receiving and discharging passengers upon and from such trains, a sufficient length of time to receive and let off such passengers with safety." (Hurd's Revised Stat. of 1874, chap. 114, sec. 63, page 811). Among the laws of 1879, printed by authority of law and certified by the Secretary of State, is the following amendatory Act :

"An Act to amend section 25 of 'An Act in relation to fencing and operating railroads,' approved March 31, 1874, in force July 1, 1874. Approved May 29, 1879, in force July 1, 1879.

"Section 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* That section 25 of an Act entitled 'An Act in relation to fencing and operating railroads,' approved March 31, 1874, in force July 1, 1874, be amended so as to read as follows :

"Section 25.—(Time of stop at stations.)—Every railroad corporation shall cause its passenger trains to stop, upon its arrival at each station advertised by such corporation as a place for receiving and discharging passengers upon and from such trains, a sufficient length of time to receive and let off passengers with safety : *Provided,* all regular passenger trains shall stop a sufficient length of time at the railroad station of county seats to receive and let off passengers with safety.— Approved May 29, 1879." (Laws of Ill. 1879, page 225).

The amendment of 1879 to section 25 of the Act of 1874 was the proviso at the end of the section. It is claimed, that the amendatory Act above set forth was not adopted in accordance with the requirements of the constitution, and that,

therefore, the said proviso is not now in force. The provision of the constitution, which is alleged to have been violated in the passage of the Act, is the first clause of section 13 of Article 4. That clause requires, that "every bill shall be read at large on three different days in each House."

It is not denied, that the amendatory Act received the signatures of the Speakers of both houses and the approval of the Governor. Such verification is *prima facie* evidence of its validity as a legislative enactment. But it is the settled law of this State, that the journals of either branch of the legislature may be resorted to for the purpose of overcoming such *prima facie* evidence. It may be shown from the journals, that an Act was not passed in the mode prescribed by the constitution. (*Spangler* v. *Jacoby*, 14 Ill. 297; *Turley* v. *The County of Logan*, 17 id. 151; *Prescott* v. *The Board of Trustees*, 19 id. 324; *The People ex rel.* v. *Starne*, 35 id. 121). Accordingly, upon the trial below, the respondent introduced in evidence the official journal of the House of Representatives of the Thirty-first General Assembly, and read therefrom so much as refers to said amendatory Act of 1879. It was thereby proven, that on March 25, 1879, Mr. Graham introduced House Bill No. 833, a bill for "An Act to amend 'An Act in relation to fencing and operating railroads,' approved March 31, 1874, in force July 1, 1874," and the title was read, and the bill was referred to the committee on railroads; that, on March 26, that committee made the following report: "The committee on railroads, to whom was referred House Bill No. 833, being a bill for 'An Act to amend section sixty-three of 'An Act in relation to fencing and operating railroads,' approved March 31, 1874, in force July 1, 1874,' * * * report the same back to the House and recommend that it do pass;" that said report was adopted and the bill ordered to its first reading; that, on March 27, House Bill No. 833 for "An Act to amend section 63 of 'An Act in relation to fencing and operating railroads,' approved March 31, 1874, in force July 1,

1874," was read at large a first time, and ordered to a second reading; that, on April 7, House Bill No. 833 for "An Act to amend section 63," etc., as last above described, was read at large a second time, and an amendment was offered and adopted, amending section 63, line 4, by inserting the word "passenger" between the words "regular" and "trains," so as to make it read "provided all regular passenger trains," and the bill was ordered engrossed for a third reading; that, on April 12, the committee on enrolled and engrossed bills reported that "House Bill No. 833, a bill for 'An Act to amend section 63,'" etc., as last above described, had been correctly engrossed and was therewith returned; that, on April 23, "House Bill No. 833 for 'An Act to amend section 63,'" etc., as last above described, was taken up out of its order by consent, and the following amendment was offered and adopted: "Amend the title of the Bill by inserting the words "twenty-five," in lieu of the words "sixty-three," also amend the bill by striking out the words "sixty-three," and figures, "63," wherever they occur in the bill, and insert in lieu thereof, the words "twenty-five," and the figures "25;" that the bill was thereupon engrossed for a third reading; that, on April 25, the committee on engrossed and enrolled bills reported that "House Bill No. 833, a bill for 'An Act to amend section twenty-five of 'An Act in relation to fencing and operating railroads,' approved March 31, 1874, in force July 1, 1874,'" had been correctly engrossed and was therewith returned; that, on April 30, "House Bill No. 833, for 'An Act to amend section sixty-three of 'An Act in relation to fencing and operating railroads,' approved March 31, 1874, in force July 1, 1874, (having been printed) was read at large a third time, and the question being: shall this bill pass? it was decided in the affirmative; yeas, (names) * * * 83, nays (names) 20; * * * ordered that the title be as aforesaid, and that the clerk inform the Senate thereof and ask their concurrence therein;" that, on May 28, the Senate reported to the House

that it had concurred with them in the passage of "House Bill No. 833, a bill for 'An Act to amend section twenty-five of 'An Act in relation to fencing and operating railroads,' approved March 31, 1874, in force July 1, 1874 ;" that, on May 29, 1879, the joint committee on enrolled bills reported that "House Bill No. 833, 'An Act to amend section twenty-five of an 'Act in relation to fencing and operating railroads,' approved March 31, 1874, in force July 1, 1874," had been correctly enrolled and had been on that day laid before the Governor for his approval; that, on May 30, the Governor sent a message to the House informing it, that he had approved and signed "House Bill No. 833, 'An Act to amend section twenty-five of 'An Act in relation to fencing and operating railroads,' approved March 31, 1874, in force July 1, 1874."

The position of the counsel for the appellant is, that a bill numbered 833 for an Act to amend section 63, etc., was read three times in the House and passed by it, but that a bill to amend section 25 of the Act in question was not read three times, nor passed by the House. It is, therefore, argued that the amendatory Act of 1879, which was an Act to amend section 25, never became a law. We are unable to concur in the view, that the Act of 1879 was not legally adopted.

The original Act of March 31, 1874, in relation to fencing and operating railroads, contained but 39 sections when standing by itself and apart from any other Act upon the general subject of railroads. It was first published in the revision of the Statutes issued in 1874, denominated "The Revised Statutes of the State of Illinois A. D. 1874." Chapter 114 of this Revision is entitled "Railroads and Warehouses," and contains a number of Acts of the Legislature upon those general subjects. In the arrangement of these Acts in the chapter, the original numbers of the sections of each separate Act are retained, but new numbers are given to the sections of the various Acts, taken as a whole and considered as parts of the chapter. These new numbers run from 1 to 147 inclusive.

It follows, that each section in chapter 114 of the revision contains two numbers, one being the original number of the section in the original Act, and the other being the number of the section as a part of a collection of Acts constituting a chapter with a common designation. By reference to the Revised Statutes of 1874 it will be seen, that section 25 of the original Act of March 31, 1874, is numbered 63 as a part of chapter 114. The section, as it there appears, has two numbers, to-wit: 63 and 25. Both numbers were intended to designate the same subject-matter. It is easy to see how the committee, who reported the amendment back to the House, were misled into describing the section as section 63, in view of the fact that it was so numbered in the Revision of 1874. There was in 1879 no other authorized publication of the Act of March 31, 1874, except The Revised Statutes of 1874. Section 1 of An Act to provide for the publication of the Revised Statutes of the State, approved March 30, 1874, in force July 1, 1874, directed, that, immediately after the close of the session of 1874, all the general Statutes of the State, which would be in force on July 1, 1874, should be compiled and published in a volume to be entitled "The Revised Statutes of the State of Illinois, A. D. 1874;" section 2 provided, that the revised Acts of 1871-2 and 1873-4 should "be annotated so as to show, by proper reference, the original Acts and sections therein;" section 17 directed, that the Secretary of State should print in pamphlet form the Acts passed at that session not embraced in the Revised Statutes, and that he should not include therein those published in the Revised Statutes. (Rev. Stat. of 1874, pages 811 and 1046.)

While it was technically incorrect to designate the amendatory Act in the title thereof as an Act to amend section 63 of the original Act, in view of the fact that said original Act contained no section 63, yet, at the same time, there was a certain section of the original Act, which was designated as section 63 in the legally authorized publication of the Revised Statutes

of the State. The section so designated as section 63 of chapter 114 was the same as section 25 of the original Act. There can, therefore, be no uncertainty as to what the legislature intended to amend, nor is it possible that any member of the legislature could have been misled by the title of the Amendatory Act. The great object of the rules and maxims of interpretation is to discover the true intention of the law; and whenever that intention can be indubitably ascertained from allowed signs and by admitted means, courts are bound to give it effect. (Potter's Dwarris on Stat. and Cons. p. 178; *County of St. Clair* v. *Bollman,* 15 Brad. 279).

The constitution provides, that "no law shall be　＊　＊　＊ amended by reference to its title only, but　＊　＊　＊　the section amended shall be inserted at length in the new Act." (Cons. Art. 4, Sec. 13). The section here intended to be amended was the section of the Act of 1874, which had reference to the stoppage of passenger trains at stations; and that section, together with the proviso which constituted the amendment to it, was set out in full in the amendatory Act, and was read on three different days in the house; and it will be presumed to have been read on three different days in the Senate, as the record contains no proof to the contrary. *(Larrison* v. *P. A. & D. R. R. Co.* 77 Ill. 11). It is not pretended, that there were two different bills having the same number. There was but one House Bill No. 833. This designation was kept unchanged in the passage of the bill through both houses, and was affixed to the Act when it was reported as enrolled, and also when it was reported as approved by the Governor. The identity of the body of the bill, through every step from its introduction in the house until it was finally declared a law, is thus sufficiently established. *(Larrison* v. *P. A. & D. R. R. Co. supra; Plummer* v. *The People,* 74 Ill. 361; *Walnut* v. *Wade,* 103 U. S. 683). After the second reading the number of the section was changed by amendment from 63 to 25, and thereafter the bill came before the House four times as a bill to

amend section 25. As the bill preserved its identity by holding its number, "833," it cannot be said that it was not constitutionally passed. (*Walnut* v. *Wade, supra*). Whether the title be regarded as incorrectly designating the number of the section, or the amendment as making a change in the title, neither the wrong designation nor the change were matters of substance, nor were they calculated to mislead as to the subject of the bill; and, consequently, the one may be regarded as merely a clerical mistake, in no wise impairing the validity of the law; and as to the other, it may be said that there is no provision of the constitution, which requires a bill to preserve the same title through all its stages in both houses. (*Plummer* v. *People, supra; Walnut* v. *Wade, supra*). "An unessential false description can never defeat a grant, contract or other instrument, nor should it defeat a statute." (*School Directors* v. *School Directors*, 73 Ill. 249; *Binz* v. *Weber*, 81 id. 288).

2. The appellant claims, that it has not violated Section 88 of the Railroad Law by failing to run passenger trains to the station at Cairo, which is the county seat of Alexander County. In order to show that appellant was guilty of such violation, appellee introduced testimony to prove that a certain train known as the "fast mail train" did not stop at the passenger station in Cairo. The company denies and the People affirm, that the "fast mail train" was a "regular passenger train" within the meaning of said section 25 or 63, now known as section 88 of the general law in regard to railroads and warehouses. (Starr & Cur. Ann. Stat. chap. 114, sec. 88, page 1943).

In the year 1855 the appellant company completed the construction of its road, and located its regular passenger station or depot in what is now the city of Cairo at a point something over a quarter of a mile from the junction of the Ohio and Mississippi rivers, known as the intersection of Second and Ohio Levee streets. The said station has been there main-

tained and continuously used for a period of more than thirty-six years. The city of Cairo was incorporated in 1857, and became the county seat in 1859. In the year 1889 a railroad bridge was built across the Ohio river about two miles north of said station, which bridge has been since used by appellant for the passage of its cars and trains over the river. The elevated approach to the north-western end of the bridge on the Illinois side of the river was built by the appellant company. The foot of this approach is about three miles north of the station, and about 3000 feet north of the corporate limits of Cairo. The .approach rises from the grade of the railroad, and is about 20 feet above the level of the ground when it reaches the corporate limits and more than 50 feet above the ground when it reaches the northwesterly end of the bridge. The evidence shows, that the fast mail train, running from Chicago to New Orleans, passes over the bridge on its way southward, without going to, or stopping at, the station in Cairo.

The fast mail train was put upon the road about July 1, 1890. When it first began to run, it left Chicago with a mail car and a baggage car. Afterwards it would leave that city with a mail car, a combination car and a compartment car, the latter being "used for such passengers as choose to travel in it." The combination car was a baggage and smoking car combined. Upon reaching Champaign the train would take on another passenger coach for Jackson, Tennessee. In January 1891, it began to take on at Du Quoin still another passenger coach from St. Louis for Cairo. About the time this suit was begun, the train was in the habit of arriving at Mounds Junction, eight or nine miles north of the Cairo station, with a mail car, a combination car, a compartment car and two regular passenger coaches. A short train would run up from Cairo and meet the fast mail train at Mounds Junction, transferring to the latter passengers bound for the south from Cairo, and carrying to Cairo, on the return trip, passengers on the mail train desiring to go to Cairo. After the

beginning of the present suit, the short train from Cairo would meet the fast mail train at Bridge Junction, three miles north of Cairo. The fast mail train, in crossing the bridge, and the approach thereto, on its way southward passes through a portion of the corporate limits of the city. A part of the time, the fast mail train and the short train from Cairo would exchange engines at Mounds Junction, or Bridge Junction. The fast mail train is a daily train running on schedule time. There is proof, that it will stop at any station between Du-Quoin and Cairo to put off passengers holding tickets from St. Louis. The time tables and Travellers' Guide, as set out in the record, show that it is advertised by appellant as a passenger train, being train No. 41, and leaving Chicago at 3 :15 A. M., with through coach to New Orleans, and a sleeping car from Water Valley to New Orleans.

Under the facts thus detailed, we think the fast mail train was a "regular passenger train" within the meaning of the statute, although its main object, as originally organized, may have been the expeditious transportation of the United States mail from Chicago through to New Orleans. In *C. & A. R. R. Co.* v. *The People*, 105 Ill. 657, where a train known as the "Kansas City Express," being a through train from St. Louis to Kansas City, failed to stop at Carrollton, the county seat of Greene County, it was claimed that such Express train was not a "regular passenger train;" but we held it to be such, because it was equipped and operated in the same manner as any other passenger train upon the road, and carried passengers and baggage as did other trains, and ran upon the official time table of the company as other trains did, and only differed from other passenger trains in that it did not stop at all the stations. In that case we said: "The language of the act would not, perhaps, include a wild train, a freight train, an excursion train or a special train; but where a train was engaged in carrying passengers, running regularly every day upon an advertised time card of the company, equipped as all

other passenger trains are, we are satisfied such a train was designed by the legislature to fall within the terms of the act, 'all regular passenger trains.' Had the legislature intended to except a fast train or a through train from the operation of the law, it would have been an easy matter to have framed the law in such a way that no doubt could have existed in regard to the intention, and if such had been intended, language of a different character would no doubt have been used." To the same effect is *O. & M. Ry. Co.* v. *The People,* 29 App. Ct. Rep. 561.

One of the witnesses of the company, upon the trial below, who was an assistant of appellant's second vice-president, was asked the question whether the fast mail train was a regular passenger train, but, upon objection made, was not allowed to answer. The refusal of the Court to permit him to answer is claimed by the appellant to have been erroneous, but we think the ruling of the trial judge was correct. The witness was asked to decide the very question, which the court trying the case without a jury was called upon to decide. A witness is not permitted to give his opinion as an expert in reference to a matter, which does not involve a question of science, skill or trade. To determine whether a train is a regular passenger train is not a subject, which "so far partakes of the nature of a science as to require a course of previous habit or study, in order to the attainment of a knowledge of it." *(Linn* v. *Sigsbee,* 67 Ill. 75 ; *Wight Fire Proofing Co.* v. *Poczekai,* 130 id. 139). The opinions of witnesses should not be asked in such a way as to cover the very question to be found by the jury or court. *(C. & A. R. R. Co.* v. *S. & N. W. R. R. Co.* 67 Ill. 142.) Where the matter inquired about requires no special knowledge, and may be determined by a jury upon a sufficient description of the facts in regard to it, it is not proper to receive the testimony of experts. *(Hopkins* v. *Ind. & St. L. R. R. Co.* 78 Ill. 32 ; *City of Chicago* v. *McGiven,* id. 347 ; *Pennsylvania Co.* v. *Conlan,* 101 id. 93).

29—143 Ill.

3.   Another proposition of the appellant arising out of the assignments of error is, that the fast mail train does not come within the purpose and intent and legal effect of the proviso of said section 88.   If we understand the position of counsel upon this branch of the case, it is, that section 88 has no application to the fast mail train, because that train does not go to or pass the passenger station at Cairo, but leaves the main line of the road three miles north of Cairo, and veers off to the south-east upon the new track, recently constructed upon the approach to the bridge.   In other words, the construction, which counsel place upon the proviso to section 88, is, that, where the passenger train of a railroad company passes a passenger station at a county seat on its way to some destination beyond the county seat, it must stop at the station long enough to receive and let off passengers, but that, if it is not necessary for such train to pass the station at the county seat, it is not obliged to go there, or to stop there.   This construction limits the proviso to a mere requirement as to the length of time, during which trains must stop at railroad stations of county seats in case they happen to pass such stations.   If such is the correct view of the proviso as applied to such a state of facts as is disclosed by the record now before us, every railroad company in the State, which has been in the habit of stopping its passenger trains at such stations, may turn them into some other track at a point within a short distance of the station, and pass around the county seat altogether.   We think, that where a railroad company has constructed its road through or in a county seat, and located a passenger station there, and maintained such station for years, it is required by this proviso to continue to go there and to stop there ; and its obligation to perform this duty is not affected by the circumstance that such station may be the terminus of the road.

It was so held by this Court in *The People ex rel.* v. *L. & N. R. R. Co.* 120 Ill. 48.   In that case a depot in a county seat, which had been used as such for some thirteen years, was

abandoned; and a new depot was established outside of the corporate limits, to which an accommodation train was run from the county seat twice a day to connect with passing trains; and it was held, that it was the imperative duty of the company to stop all of its regular passenger trains at the old depot, and that such duty was "expressly enjoined by the 88th section of chapter 114 of the Revised Statutes." The following language was there used: "The fact that these trains may stop at the new depot, a quarter of a mile beyond the corporate limits of the town, does not relieve the company either from its common law or statutory duties in this respect. For this purpose the stopping of its trains miles distant from the town would be equally available, unless it can be said, as matter of law, that the stopping of a train a quarter of a mile *from* a place is stopping it *at* the place, which, of course, it cannot be. The very statement of the proposition involves an absurdity so gross in its character as to forbid serious consideration."

Section 2 of appellant's charter empowered it to construct, maintain and operate a railroad "from the southern terminus of the Illinois and Michigan Canal to a point at the city of Cairo, etc." (Adams & Durham's Real Est. Stat. & Dec. of Ill. p. 1755). The selection of the point at the city, to which the road was to be constructed, was within the discretion of the company. The company fixed the corner of Second and Levee streets, or, as is claimed by its counsel, a point 950 feet south of said corner, as the terminus of its road, and built a passenger station and depot at said corner, and laid its tracks to the depot, and stopped all of its trains there from 1855 to 1890, a period of thirty-five years. The discretion, with which it was clothed as to the location of its terminus, has been exercised. As was said in *The People* v. *L. & N. R. R. Co. supra,* in regard to McLeansboro, so may it be said here of Cairo: "During this time, business interests have doubtless grown up and shaped themselves with reference to the location as originally fixed by the company. Property has, no doubt, been bought and sold

upon the faith of the company's action, and it may well be assumed its value is affected more or less by it."

Where a railroad company has fixed the terminal point of its road in a town or city, it cannot afterwards change the location. (*The People v. L. & N. R. R. Co. supra*; *C. & A. R. R. Co.* v. *Suffern*, 129 Ill. 274). "The power of the company to determine its location, when once exercised, is exhausted. It may have a discretion as to its termini, or the selection of its intermediate points, or its route between certain fixed points; but, having exercised the discretion, it cannot change the location without legislative authority." (Pierce on Railroads, pp. 254, 255, quoted in *People* v. *L. & N. R. R. Co. supra*.).

The appellant company is required by its charter to operate its road as a continuous line to the point selected and used and maintained by it as the southern terminus of its road. It cannot make Mounds Junction, or Bridge Junction, the southern terminus. It has no right to treat the legal and actual terminus at the corner of Second and Levee streets in Cairo as though its station in that city was on a side or spur track, to be visited only with such cars or trains as it sees fit to send there. The requirement of the law is not met by the use of short trains for transfer purposes. (*Union Pacific R. R. Co.* v. *Hall*, 91 U. S. 343; *State* v. *Hartford & N. H. R. R. Co*, 29 Conn. 538; *U. S.* v. *U. P. R. R. Co.* 4 Dill. 478; *The People* v. *L. & N. R. R. Co. supra; O. & M. Ry. Co.* v. *The People*, 120 Ill. 200; *C. & A. R. R. Co.* v. *Suffern, supra*). As the charter required the road to be built "to a point at the city of Cairo," and as the road was built up to a selected and designated point in said city, towit: the corner of the streets above mentioned, and a depot was established there at the end of the line, "the defendant has no discretion as to which of its passenger trains it will stop there and which it will not." (*The People* v. *L. & N. R. R. Co. supra*). It may suit the interest or convenience of a railroad company, that certain of its trains, destined for distant points in other States and known as "through trains,"

should follow a new route and pass around or away from one of its long established depots; but such a mode of operating the "through trains," where the depot so established is both the railroad station of a county seat and the legal terminus of the original road in this State, amounts not only to an evasion of the proviso to section 88, but, virtually and in effect, to an abandonment of a part of the company's road. It was said in *The People ex rel.* v. *L. & N. R. R. Co. supra*: "The fact that through business may be more remunerative than way business affords no justification for neglecting the way business. Nor can the company abandon its road, or any part of it, without rendering its franchises liable to forfeiture."

4.   It is also contended by the appellant, that the enforcement of the proviso to section 88, to the extent of compelling appellant to operate its south bound fast mail train down into Cairo, would conflict with section 8 of article 1 of the Constitution of the United States, which confers upon Congress the power "to regulate commerce   *   *   *   among the several States." That the proviso in question is not invalid, as being a regulation of inter-state commerce, has been expressly decided by this Court.    In *C. & A. R. R. Co.* v. *The People, supra,* it was claimed that, if this statute was broad enough to include the "through train" above mentioned known as the "Kansas City Express," its effect was a regulation of commerce between the States, and hence was inhibited by the federal constitution; but we held, that the statute did not undertake to regulate commerce between the States; that it imposed no restriction upon the introduction or transportation of any article of commerce, and was but a proper exercise of the police power of the State.    The following language there used is applicable here: "This railroad company accepted its charter upon the implied condition, that its franchises would be exercised subject to the power of the State to impose such reasonable regulations, as the comfort, safety or welfare of society might require.   *   *   *   Did the Act contribute to

the comfort, safety or welfare of the public? If it did, and did not deprive the company of any essential right.conferred by its charter, its passage was a proper exercise of the police power. (Cooley on Const. Lim. 577; Potter's Dwarris on Stat. and Cons. 458; *Lake View* v. *Rose Hill Cemetery*, 70 Ill. 191). In the enactment of the law requiring all regular passenger trains to stop at county seats, the legislature, no doubt, had in view the great benefit the public would derive in the increased facilities for reaching the county seat, to aid in the dispatch of business in courts, in the prompt arrest and prosecution of criminals who might be indicted in the courts, in the attendance of witnesses, grand and petit jurors,—indeed, the prompt and efficient transaction of all business in the courts held at the county seat, and the facility for the examination of the records on the sale and conveyance of property. These and various other matters` pertaining to the welfare of the public doubtless led to the enactment of the laws, etc." The views thus expressed are sustained by the following cases: *Stone* v. *Farmers' Loan & Trust Co.* 116 U. S. 307; *Stone* v. *Ill. Cen. R. R. Co.* id. 347; *Smith* v. *Alabama*, 124 U. S. 465; *Louisville, N. O. & T. Ry. Co.* v. *Mississippi*, 133 U. S. 587; *Davidson* v. *The State*, 4 Texas Ct. of App. 545.

Counsel for appellant concede, that section 88 is not a regulation of inter-state commerce, if it be construed as merely requiring regular passenger trains, which pass through county seats, to stop long enough at the stations there to receive and let off passengers with safety. But it is claimed, that the section is a violation of the federal constitution and an interference with the federal government, if it be so enforced as to require a fast train, carrying the United States mail and on its way to New Orleans through several States south of the Ohio river, to go to the regular passenger station at Cairo, and stop there long enough to receive and let off passengers with safety, instead of proceeding over the Ohio river bridge without going to said station.

It is true, that certain clauses of the Act of Congress of September 20, 1850, donating sections of the public lands to the State of Illinois to aid in the construction of the railroad which appellant afterwards built, and also a clause in the charter granted to appellant by the State of Illinois in February, 1851, provide for the transportation of the government mail, and of any property or troops of the United States. (2 Starr & Cur. page 1980, chap. 114, secs. 4 and 6; 2 Adams & Durham's Real Est. Stat. & Dec. page 1759, sec. 19). But we apprehend, that such arrangement, as the appellant company may have with the Post Office department of the Federal Government for the transportation of the mail, cannot have the effect of abrogating a reasonable police regulation of this State. Sections 1 and 2 of the above named Act of Congress grant land and right of way to the State of Illinois for the construction of a railroad "to a point at or near the junction of the Ohio and Mississippi rivers," and provide that "the construction of said road shall be commenced at its southern terminus at or near the junction of" said rivers. Congress left it to the State, or to a company to be chartered by the State, to select the particular point, at or near such junction, which was to be the southern terminus. A subsequent contract with the Post Office department would not authorize the appellant to abandon the use of any part of the road thus constructed to a point selected in pursuance of a discretion conferred by the federal Congress. It was held by the Supreme Court of the United States in *Stone* v. *Farmers' Loan & Trust Co. supra*, that, in case of a railroad whose construction had been aided by Congress so as to establish a route of travel through several States, a State has the power to make all needful regulations of a police character for the government of the company operating the road within the jurisdiction of the State; and that among such regulations are those, which require the company to stop trains at railroad crossings, to slacken speed through a crowded thoroughfare, and to do other things "affecting the comfort, the convenience

or the safety of those * * * entitled to look to the State
for protection," etc. In *Smith* v. *Alabama,. supra,* the same
Court said that "the rate of speed at stations and through vil-
lages, towns and cities" was a matter of State regulation. If
the requirement, that the mail train go to Cairo and stop long
enough to receive and let off passengers with safety, interferes
in any way with the carriage of the mail, it must be by reason
of the delay supposed to be thereby created. But the amount
and extent of the delay must be left to the State authorities to
determine, subject to the qualification that such delay is not
unreasonable. Requiring trains to stop at crossings and to
slacken their speed through cities and villages creates delay.
It does not appear, that stopping at the Cairo station will
create any unreasonable delay. On the contrary, the proof
shows that a vestibule.passenger train running from Chicago
to New Orleans, which stops at the Cairo station, performs
the journey from Chicago to New Orleans within the same
time as such journey is made by the "fast mail train."

It is true, that section 7 of said Act of Congress grants the
same rights, etc., which are granted to Illinois, to the States
of Alabama and Mississippi in order to aid in the continuation
of a railroad from the mouth of the Ohio river to Mobile. But
the fact that Congress has aided several states by the donation
of public lands for the construction of railroads which may
eventually form one continuous line, does not relieve the com-
panies operating such roads from the control of the States
granting them their respective charters. In *Stone* v. *Farmers'*
*Loan and Trust Co. supra,* it was said, that a railroad company
was not relieved entirely from State regulation, or State con-
trol, in one State, simply because it had been incorporated by,
and was carrying on business in, the other States through
which its road ran ; that the corporation created by each State
was, for all the purposes of local government, a domestic cor-
poration and subject to the constitutional authority of the
State Government ; that the company while in the State could

be governed by the State in respect to all things, which had not been placed by the Federal constitution within the exclusive jurisdiction of Congress; that nothing could be done by the government of the State, which would operate as a burden on the inter-state business of the company, or impair the usefulness of its facilities for inter-state traffic, but that it was not enough to prevent the State from acting, that the road therein was used in aid of inter-state commerce; that "legislation of this kind to be unconstitutional must be such as will necessarily amount to or operate as a regulation of business without the State as well as within." In *Smith* v. *Alabama, supra,* the Federal Supreme Court again said: "It is to be remembered that railroads are not natural highways of trade and commerce. They are artificial creations; they are constructed within the territorial limits of a State, and by the authority of its laws, and ordinarily by means of corporations exercising their franchises by limited grants from the State. The places where they may be located, and the plans according to which they must be constructed, are prescribed by the legislation of the State."

Counsel refer to the Act of the legislature of this State, enabling railroad companies to enter into operative contracts, approved February 12, 1855, and to the "Act to facilitate travel and transportation," approved February 25, 1867, as in some way committing the State to a waiver of its control over railroad companies chartered by it which have connections with railroads operating in other States. We cannot see how these Acts can be construed as authorizing the results which are claimed to flow from them. The Act of 1855 merely empowers railroad companies, organized in this State, to make contracts with railroad companies in other States for leasing or running their roads and for other purposes. The privilege of connecting with a foreign road does not impair the obligation to submit to the control of the State which has granted the Charter, nor does it involve the right to change the estab-

lished line or terminus of the original road. The Act of 1867 provides for the connection of railroads with the rails of a railroad bridge in cases, where such railroads "terminate at any point on any line of continuous railroad thoroughfare," and where the bridge is so constructed as to be a part of such thoroughfare. The Act expressly provides, that "by such connections no corporate rights shall be impaired." (For Acts of 1855 and 1867 see 2 Starr & Cur. Stat. pages 1921-1922). As we understand the Act of 1867, it contemplates a case where the railroad as extended to the bridge from its terminus, and the rails on the bridge, shall together constitute one thoroughfare. In the present case, however, the appellant has not extended its road to the bridge from the terminus at the corner of Second and Levee streets in Cairo, but from a point three miles north of the terminus. Hence, the necessity for avoiding the terminus in reaching the bridge, if such necessity exists, has been created by appellant's own act in so constructing the approach to the bridge, as not to make the legal terminus of the road a part of the continuous thoroughfare over the bridge.

5. It is urged by counsel for appellant, that the writ of mandamus should have been refused by the trial court upon the alleged ground, that the exercise of a sound judicial discretion would naturally lead to such refusal. If a clear legal right to the writ is shown by the party applying for it, he is entitled to its issuance. (*C. & A. R. R. Co.* v. *Suffern, supra*). We think such showing is made in this case.

It is said, that the judgment is too broad in ordering appellant to stop all of its regular passenger trains at the Cairo station, when it appears from the pleadings and proofs, that the fast mail train is the only regular passenger train which does not stop there. As it was the duty of the appellant to stop all of its regular passenger trains at said station, a violation of its duty was shown when the failure to stop one of such trains was proven. It was not necessary to show that the neglect to comply with the statute extended to all the

regular passenger trains.   The respondent demurred to the petition upon the ground, among other grounds, that the prayer of the petition was broader than the petition itself.   Its demurrer was overruled, and it answered the allegations of the petition.   There was thereby a waiver of the cause of demurrer.   "The alternative writ stands in the place of a declaration, to which the return is an answer."   (*Silver* v. *Whitmore*, 45 Ill. 224.)   The respondent, having elected to try the case upon its merits, cannot now urge such an objection as this to the petition.

The judgment of the Circuit Court is affirmed.

*Judgment affirmed.*

BAILEY, C. J.:   I do not concur in this decision.