PEOPLE ex rel. SWEENEY v. ROCK ISLAND & P. RY. CO.

(Circuit Court, S. D. Illinois. January 13, 1896.)

REMOVAL OF CAUSES—FEDERAL QUESTION—INTERSTATE COMMERCE.

Mandamus proceedings to compel a railroad engaged in interstate commerce to run its trains to a certain station in.obedience to a state statute involve a federal question, since a judgment therein may impose a burden on interstate commerce.

At Law.

Petition by the people, on the relation of M. E. Sweeney, against the Rock Island & Pacific Railway Company for mandamus. The case was removed to the United States court on the petition of the defendant. Plaintiff moves to remand.

M. E. Sweeney, J. L. Hass, and W. H. Gest, for complainant.

Henry Curtis and Stevens & Horton, for defendant.

GROSSCUP, District Judge. The relator filed in the circuit court of Rock Island county his petition for mandamus to compel the defendant railroad corporation to run its passenger trains to the station originally established by it in the city of Rock Island. The railway company has filed a petition to remove the case to this court, and the motion now is to remand the same to the state court.

The original petition, and the petition for removal, read together, show that the defendant was first chartered by the legislature of Illinois in 1847 to build and operate a railroad from the town of Rock Island to La Salle, with power to unite its line with that of any other railroad, and to construct such other and lateral routes as might be deemed necessary or expedient. Subsequently, the charter was amended to extend the line to Chicago, and on the completion of this line, the depot at the Rock Island terminus was established at the foot of Twentieth street in that city. One of the statutes of the state of Illinois, now known as section 88 of the chapter relating to railroads and warehouses, provides that every railroad corporation shall cause its passenger trains to stop, upon their arrival at each station advertised by such corporation as a place for receiving and discharging passengers upon and from such trains, a sufficient length of time to receive and let off passengers with safety; and also that all regular passenger trains shall stop a sufficient length of time at the railroad station of county seats to receive and let off passengers with safety. The supreme court of Illinois (Illinois Cent. R. Co. v. People, 143 Ill. 434, 33 N. E. 173) have held that, under this statute, a railway corporation organized under the laws of Illinois is required to run all its passenger trains into the station originally established at the terminal city; that such city and its people have to a certain extent acquired a vested right that the station shall be maintained at that locality, without regard to the subsequent interest or convenience of the railroad company. From this construction of the statute it pretty clearly appears that the defendant, if it were wholly an intrastate road, would be required to maintain its station at the original locality, and run

to such station all its passenger trains. But, about the time the Illinois line was chartered, there was organized, under the laws of Iowa, a railway company to build and operate a road from the eastern line of the state, at a point opposite the island of Rock Island, to Council Bluffs. To connect these two roads, at that time separate corporations, a bridge company was organized, under the laws of Illinois, to build a bridge across the Mississippi river. This connecting link, which included a line of road across the island of Rock Island, was completed in 1856. Ten years later the two railway companies were consolidated, under acts of the legislatures of both Illinois and Iowa, and thereafter, under the name of the Chicago, Rock Island & Pacific Railroad Company, became a single line of railway. The company has since extended its line throughout the states of the West, and now operates some 3,500 miles of road, nearly all the through traffic of which passes over the bridge at Rock Island, and, thence, over the original line from the Mississippi river to Chicago.

Prior to 1870 the congress of the United States determined to use the island of Rock Island for a military arsenal. The plans of the government required a change in the location of the bridges and of the embankments and tracks of the company across the island. New bridges, at a large expense, were built, and the tracks of the company changed to conform thereto. But these changes compelled a change of location of the lines on both sides of the river, whereby the original passenger station in Rock Island was left a mile or more westward of the main line of the road. The change was not arbitrary nor unreasonable, but was brought about by the action of the general government, whereby the island became one of its military posts, and at an expense to both the government and the railway company that excludes the idea of any other purpose than a deep sense of the public necessities. A continued use of the original station thereafter as a stopping place for all passenger trains would have required the railroad company to divert these trains from the main line, over the connecting link and back again, a distance, altogether, of two miles or more. The city of Rock Island, in the meantime, had grown up around this end of the old road, so that the connecting link ran through a thickly-populated district, and across a number of busy streets. To maintain a depot at that point for its through passenger trains clearly entailed a great loss of time in the dispatch of these trains eastward and westward from Rock Island. The company, accordingly, in December, 1872, established a new station, about a mile eastward of the old one, and in 1878 established its station again still further eastward, so that it is now about a mile and one-third east of the original station. Since 1872 the company has refused to run any of its passenger trains to the original station, and its only stopping point now is at the station established in 1878.

The prayer of the relator, that all the passenger trains of the defendant company be required to stop at the original station, is not limited to passenger trains running only within the state of Illinois, but includes, as well, all the trains of the company that are used

to convey passengers from one state into another, and, in that aspect of the case, comes under the consideration of this court upon the pending motion.

The single question presented on this motion is, does the controversy between the parties involve a federal question? The contention of the relator is that the statutes of Illinois, as interpreted by the supreme court, require the defendant railroad company to stop all its passenger trains at the original depot. The defendant resists, upon the ground that such a requirement by the state creates a substantial and serious burden upon interstate commerce. On the motion to remand, my sole duty is to ascertain if any such defense can probably and fairly be interposed. The merits of the question should not now be prejudged except so far as to ascertain whether any fairly probable case of a burden upon interstate commerce is presented in the record at all. A mere shadowy or speculative involvement of such a question in the record is not sufficient to justify this court's taking jurisdiction. Federal questions can be easily suggested, as speculatively possible, in almost every litigation. But it is only when they come face to face with the court, as practical questions, and actualities in the cause, that the court should notice them at all. · The question thus recurs, will a judicial determination of the relator's and the defendant's rights in this cause fairly involve a decision of the question whether an enforcement of this statute, as interpreted by the supreme court of Illinois, imposes a burden upon interstate commerce?

The supreme court of the United States has passed upon many cases where state statutes, or acts of the state authorities, have been held to be a burden upon interstate commerce; but none of them are of the character of the legislation here complained of. "It has been uniformly held, for example, that the states cannot, by legislation, place burdens upon commerce with foreign nations or among the several states. 'But, upon an examination of the cases in which they were rendered,' as was said in Sherlock v. Alling, 93 U. S. 99, 102, 'it will be found that the legislation adjudged invalid imposed a tax upon some instrument or subject of commerce, or exacted a license fee from parties engaged in commercial pursuits, or created an impediment to the free navigation of some public waters, or prescribed conditions in accordance with which commerce in particular articles or between particular places was required to be conducted. In all the cases, the legislation condemned operated directly upon commerce, either by way of tax upon its business, license upon its pursuits in particular channels, or conditions for carrying it on.'" Smith v. Alabama, 124 U. S. 473, 8 Sup. Ct. 564. A tax upon an interstate business, or a requirement that would destroy, limit, or regulate such business, except for compliance with its provisions, is entirely different from legislation which seeks to regulate only the manner in which a railroad company shall manage its trains at a given city.

The supreme court has, on the contrary, passed upon many cases where it has been held that the legislation of the state,

prompted by considerations for the health and safety of its citizens, relating to the management of railway companies, creates no burden upon interstate commerce, notwithstanding it may incidentally affect such commerce. Thus, for instance, a law requiring all locomotive engineers to be licensed under the authority of the state, though affecting engineers on interstate lines, was held no burden on interstate traffic. Smith v. Alabama, supra. The power of states to regulate the speed of railroad trains in the neighborhood of cities and towns, and the manner of their approach to bridges, tunnels, and curves, and other regulations of a like local and purely police nature, though indirectly and incidentally affecting interstate commerce, has been clearly recognized. Crutcher v. Kentucky, 141 U. S. 61, 11 Sup. Ct. 851. But it is manifest that, in the cases just cited, state legislation attempted nothing that was not purely of a police nature, and calculated simply to insure the life and safety of the people. Outside of the interstate commerce act, congress has never assumed to regulate interstate commerce, and has thus left such particulars of that commerce as are purely local to the rightful regulation of the states. Indeed, I greatly doubt if regulations essentially police in their nature can ever be regarded, no matter what their results, as a burden upon commerce. The life, health, and safety of the people transcend all other considerations, including consideration for the interests of commerce. Commerce has no legal or moral right to claim exemption from the operation of such laws as are necessary to protect life and property. Protective measures of that character get their existence from a higher source than the interests of commerce which they repress, and need not ask of the lower interest the right to live. Repression of commerce, thus inspired, is not, in legal contemplation, any burden, unless the duty to humanity, which every interest ought to bear, may be regarded as a burden.

If the defense interposed by the railway company, on the one hand, exhibited a case where the state legislation sought to be enforced amounted to a tax or restraint upon interstate commerce transactions proper, or, on the other hand, disclosed such legislation simply as a means to promote and protect the life, health, and safety of the people, the motion under consideration would be without difficulty. But the record discloses a case which seems to me to fall somewhere between these adjudicated extremes, and which, from this fact, and from the legal considerations there attendant, may be regarded as fairly debatable. Interstate commerce, subject to regulation by congress, includes not simply the buying and selling of goods, but also the means of their transportation, and of the transportation of persons engaged therein. The passenger trains of the defendant road run through different states, and are the vehicles by which interstate commerce is largely carried on. Any impediment to these trains, not necessitated by essentially police considerations, and serious enough to amount to a burden or restraint, caused by state legislation may, I think, be regarded as a probable invasion of the national right of regulation of interstate

commerce. What would be thought if the state should attempt, by legislation, to stop all passenger trains at every highway crossing, or reduce their speed to six miles an hour from one end of the state to the other? Could national commerce submit to any such unreasonable restriction? Would not such a restriction be, in the strictest sense, a burden upon—an attempted regulation of—interstate traffic? What argument, not merely chimerical, could be advanced, in the name of public safety and health, for such a heavily restraining hand upon the business of this generation? The facts of the case before me do not show so serious a burden, nor an attempted regulation by the state so clearly unreasonable and beyond its power; but they disclose a case that may be reasonably compared with the one supposed. The regular and enforced loss of an hour at any one point is not an inconsiderable one in the needs and methods of modern commerce. If the right to impose it exist in the state for the benefit of one city, it may be extended to the convenience of many cities, and it would not be impossible that, shortly, the traveler on commercial enterprises from one state into another might find himself delayed in every county seat into which his train went. Neither is it at all clear that the occasion for this impediment is required for public health or safety. It is probably better characterized as prompted by the wish to promote the convenience of the residents of the city. In the interpretation of the grounds upon which a police regulation can be based, the mere convenience of a city is a consideration very different from the health or safety of its people.

I have already said enough to show that, in my judgment, it is at least a subject of fair dispute whether the attempted regulation be not a burden upon interstate commerce. That conclusion settles the fate of the motion under consideration. When such a question fairly arises, either in the right invoked by the plaintiff, or the defense interposed by the defendant, there exists a case arising under the constitution and laws of the United States, which either party has a right to bring into the federal court.

The federal courts have steadily refused to lay down any rule rigidly fixing the boundaries either of the police power of the state or the interstate commerce power of the United States. Any fixed line of demarkation between these powers is, in the very nature of the case, insusceptible of exact description. No court is wise enough, by a generalization, to forecast the cases of conflict that will arise, or the line that must separate them. Only as the cases specifically arise, will the courts attempt to discern the point where police power ends and commerce regulation begins, careful, always, to see that no right belonging to the state, in the interest of the safety and health of her citizens, is appropriated by the nation, and equally vigilant that no power belonging to the nation is surrendered under the mere guise and semblance of a police regulation; and the nation, to maintain its supremacy, must always insist that cases fairly involving a national question shall be settled in its own tribunals. The motion to remand is overruled.